**UNITED STATES of America, Appellee,**

v.

**Leonard BEDNAR, Appellant.**

**No. 83-1227.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 16, 1983.

Decided Feb. 24, 1984.

Rehearing and Rehearing En Banc Denied April 2, 1984.

Thomas E. Dittmeier, U.S. Atty., Terry I. Adelman, Asst. U.S. Atty., Ronald P. Kane, Sp. Asst. U.S. Atty., St. Louis, Mo., for appellee.

Irl B. Baris, Steven C. Low, St. Louis, Mo., for appellant.

Before ROSS and ARNOLD, Circuit Judges, and HUNTER, District Judge.*

ROSS, Circuit Judge.

Appellant, Leonard Bednar, was indicted on three counts of making false material declarations before a grand jury in violation of 18 U.S.C. § 1623. In addition, Bednar, as a registered broker-dealer, was indicted on one count of making false entries on the books and records of Stix & Co., Inc., in violation of 15 U.S.C. §§ 78q to 78ff. After a six day trial, the jury found Bednar guilty on all four counts charged. On February 4, 1983, Bednar was sentenced to concurrent terms of five years imprisonment on each count and a fine of $1,000 on each count, for a total of $4,000.

Bednar has raised numerous issues on appeal including challenges to the district court's findings of materiality, the sufficiency of the evidence on count four, suppression of the grand jury testimony, the propriety of an FBI agent's testimony before the grand jury, and the court's decision to limit the time allotted to closing arguments. For the reasons set forth herein, we affirm the conviction of Bednar on all counts.

I. *General Background*

Stix & Co., Inc. (Stix), located in St. Louis, Missouri, was a broker-dealer firm engaged in the business of selling securities to the public. In November of 1981, Thomas Brimberry, a senior vice-president of Stix, revealed a major embezzlement scheme in which Brimberry, the majority shareholder, and other people siphoned enormous amounts of money from the firm. During the revelation of this scheme, Brimberry did not inculpate Bednar as a participant, although Bednar and Brimberry shared commissions on all sales made by either person. Pursuant to Brimberry's information, the FBI, the IRS and the SEC became actively involved in a complete investigation of the books and records of Stix. An examination by the SEC revealed that over thirty-four million dollars worth of securities were missing from the firm. After discovering the magnitude of the missing assets, the SEC enjoined Stix from doing any business and a temporary receiver was appointed to marshal the assets of the firm. Stix was ultimately determined to be insolvent and went into receivership. The total loss to the investing public due to the embezzlement was found to be in excess of fourteen million dollars.

The FBI determined that the money had been stolen by the manipulation of ten margin accounts controlled by Brimberry. It appears that Brimberry made false computer entries showing that large amounts of securities were placed in these ten accounts,

---

* The Honorable Elmo B. Hunter, Senior Judge, United States District Court for the Western District of Missouri, sitting by designation.

thus building up the borrowing power of these accounts. Once falsely built up, the "individual" named on the account was able to borrow, in cash, up to half the value of the bogus securities listed in the account. At various times, Brimberry placed counterfeit securities in the Stix vault to deceive the auditors. Once the appearance of equity was created in these ten accounts, Brimberry siphoned money by authorizing checks to be drawn from these accounts.

In February of 1982, a grand jury convened to investigate the embezzlement from Stix. The grand jury was attempting to ascertain how fourteen million dollars could be stolen from Stix, where the money went, who was involved in the scheme, and why, for five years, the books indicated that the firm was in good financial condition. Bednar was one of the first witnesses called to testify before the grand jury because of his position as Brimberry's immediate supervisor.

Count I alleged that Bednar falsely testified that he always sent 1087 forms (forms which alert the IRS that taxes are due on margin accounts) to the IRS and that he never told Brimberry not to send these forms to the IRS. Count II alleged that Bednar falsely testified that the only conversation he had with Alice Eads (a Stix employee) regarding the deletion of dividend entries into the Stix computer was telling her to follow Brimberry's instructions on the matter. Count III alleged that Bednar falsely testified that he had prepared the J.A. Miller new account card by sitting down with Brimberry in 1977, asking questions about the person's background, and filling out the card by using such information.

At trial, the government introduced evidence to show the falsity and materiality of Bednar's statements to the grand jury. On count I, the government's evidence showed, through the testimony of Alice Eads, that Bednar had not mailed the 1087 forms in tax year 1979 and that he told Brimberry not to mail them in 1980 as he had not mailed them the previous year. To show materiality on this issue, the government

introduced grand jury transcripts along with testimony of the grand jury foreman to clarify that the scope of the grand jury inquiry was quite broad as it included a determination of how the embezzlement scheme actually worked. The grand jury had heard evidence that the individuals involved in the scheme were worried that if the 1087 forms were sent to the IRS, an audit would be ordered upon the realization that no taxes were being paid on these margin accounts. Thus, this statement is alleged to be material as it impeded the grand jury's efforts to determine how the scheme worked and who was involved in the cover-up of such scheme. On count II, Alice Eads testified that Brimberry and Bednar told her to delete all the dividends on securities which she could not find on the premises of Stix. Eads further testified that she was told to delete the dividends from the computer and throw away the backup papers. The government submits that this was material as it impeded the grand jury in determining Bednar's role in the scheme and how the scheme operated for so long without detection. On count III, Denise Hertlein (a Stix employee) testified that Bednar filled out the J.A. Miller new account card, by himself, in 1981 after the SEC examiners asked to see such card. The grand jury transcripts introduced on the issue of materiality showed the J.A. Miller account was one of the main accounts in which the embezzlement occurred. The government contends such statement is material as it impeded the grand jury's efforts to determine the inner workings of the scheme and its participants.

## II. *Analysis*

### A. *Materiality*

Bednar asserts, on appeal, that the government attempted to prove materiality by general statements from the grand jury foreman and grand jury testimony by FBI agent Gulley. Bednar contends that the evidence in this case is insufficient to prove materiality as was the evidence found insufficient in *United States v. Cosby*, 601 F.2d 754 (5th Cir.1979). In *Cosby*, the court

held that absent a transcript of grand jury testimony, the testimony of only an FBI agent is insufficient to show materiality. We find that Bednar's reliance on *Cosby* is misplaced because in the instant case, the transcript of the grand jury proceedings *and* the testimony of the grand jury foreman supplemented the testimony of the FBI agent. This is exactly the evidence contemplated by the court in *Cosby*. *Id.* at 757.

▇▇▇ To show a violation of 18 U.S.C. § 1623 the government has the burden of proving that the defendant's statements were material to issues considered by the grand jury. *United States v. Ostertag*, 671 F.2d 262, 264 (8th Cir.1982). The test for determining materiality is whether the allegedly perjurious statement tends to impede or hamper the course of the investigation by the grand jury. *United States v. Varsalona*, 710 F.2d 418, 421 (8th Cir.1983). The question of whether the government has met its burden on the issue of materiality is for the court to decide as a matter of law. *Id.* Although materiality is a question of law, its proper determination is dependent upon the factual situation in which the testimony was given. *United States v. Armilio*, 705 F.2d 939, 941 (8th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 235, 78 L.Ed.2d 227 (1983). In *Armilio,* this court explained that the

> government must, therefore, introduce evidence of what the grand jury was investigating, and of what testimony the defendant gave. Materiality is a legal term describing a relationship between these two sets of facts. By submitting, for example, a transcript of the grand-jury proceedings, the government enables the trial court to assess a multiplicity of facts and decide as a *matter of law* whether the perjured statements were material to the grand jury proceedings.

*Id.* On review, this court must view the evidence in the light most favorable to the verdict. *United States v. Williams,* 552 F.2d 226, 229 (8th Cir.1977).

▇▇▇ In viewing the evidence in the light most favorable to the verdict, we conclude

that the government has sufficiently established both the falsity and the materiality of the statements at issue in this case. The government introduced sound evidence that the scope of the grand jury's investigation was broad and included an inquiry into the inner workings of the scheme, its participants and how it went undetected for such an extended period of time. The testimony of Bednar impeded the course of the investigation because it clouded the grand jury's inquiry into such matters as whether Bednar was actively involved, merely aided in the cover-up or, if he was not involved, why the scheme went undetected for so long. Thus, we find that the government met its burden of proving that Bednar's statements were material to issues considered by the grand jury.

### B. *New Account Card*

Count IV of the indictment charged a violation of 15 U.S.C. § 78q(a)(1) which provides, in relevant part, as follows:

> Every * * * broker or dealer * * * shall make and keep for prescribed periods such records * * * as the Commission, by rule, prescribes as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter.

The record involved was the new account card for the margin account of J.A. Miller, which the government contends was a document required to be kept by 17 C.F.R. 240.-17a–3, specifically, subparagraph 9, which requires the following be kept:

> A record in respect of each cash and margin account with such member, broker or dealer, containing the name and address of the beneficial owner of such account and, in the case of a margin account, the signature of such owner; Provided, That, in the case of a joint account or an account of a corporation, such records are required only in respect of the person or persons authorized to transact business for such account.

To support its position, the government called Denise Hertlein to testify that Bednar filled out the card himself, in 1981, with

false information and dated the card as being prepared in 1977. Further, the government called a witness, Mr. O'Rourke, from the SEC, to testify as an expert that the new account card was a document which is required to be kept by the above-mentioned SEC rule.

On appeal, Bednar basically makes three arguments on this issue. First, Bednar submits that it was error to permit O'Rourke to express an opinion on this subject because it invaded the province of the jury on the issue of whether it was a document required by the SEC. Second, Bednar asserts that the evidence was insufficient to establish that this was the document required by the SEC regulations. Third, Bednar asserts that the jury instruction on this issue was erroneous because it, in effect, directed a verdict against Bednar. The court, in Instruction No. 21, instructed the jury that the J.A. Miller new account card is a record which contains the same information as that which is required by a rule of the SEC.

 Taking Bednar's arguments in order, we find his argument as to O'Rourke's testimony to be without merit. Rules 702 and 704 of the Federal Rules of Evidence allow an expert to give an opinion on an ultimate fact without invading the province of the jury. Second, Bednar's challenge to the sufficiency of the evidence is reviewed under well established general principles. A conviction will be upheld if, taking the view most favorable to the government, there is substantial evidence to support the jury's verdict. *United States v. Richmond,* 700 F.2d 1183, 1189 (8th Cir.1983). When the evidence is viewed in this light, Bednar's allegation must fail. The testimony of Denise Hertlein coupled with that of Mr. O'Rourke provides sufficient evidence to sustain the conviction on count IV. Third, we find that Instruction No. 21 was a proper instruction to the jury. It is well established that a defendant is not entitled to a particularly worded instruction and the trial court has considerable discretion in framing the instruction. *United States v. Richmond, supra,* 700 F.2d at 1196. We find,

after a complete review of the instructions, that the trial court did not abuse its discretion in giving Instruction No. 21. When that instruction is read together with all of the instructions, there is nothing that could be construed as a directed verdict against Bednar.

### C. *Suppression of Grand Jury Testimony*

Bednar asserts that prior to his grand jury appearance, he was interviewed by government agents and advised that he was not under investigation. Bednar submits that, after looking at the grand jury transcripts, he was very much a target and potential defendant at the time he testified. Thus, Bednar contends that because he was not given any *Miranda* warnings, his testimony before the grand jury should be suppressed.

 It is well settled that *Miranda* rights are not required in the grand jury context. *United States v. Phillips,* 540 F.2d 319, 331 (8th Cir.), *cert. denied,* 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976). The failure of the government to advise Bednar of his *Miranda* rights did not violate his fifth amendment privilege against self-incrimination. Bednar was under oath when he falsely testified before the grand jury and, as such, "he took a course that the fifth amendment gave him no privilege to take." *Id.* Our legal system provides several methods for challenging the government's right to ask questions; lying is not one of them. *United States v. Brown,* 666 F.2d 1196, 1199 (8th Cir.1981), *cert. denied,* 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982).

### D. *Improper Influence*

Bednar states that after the grand jury had heard from all of the witnesses, the government again brought FBI agent Gulley before the grand jury. Bednar alleges that by a combination of leading questions and statements by the government attorney to agent Gulley, Gulley was able to tell the grand jury that they should indict Bednar. In effect, Bednar contends that Gulley be-

came the alter ego of the prosecutor telling the grand jury how to vote and to return indictments. Bednar asserts that the indictment should be dismissed because of improper influence on the grand jury.

 We find Bednar's contention to be without merit. It has long been recognized that there is no constitutional preclusion of the use of hearsay testimony in grand jury proceedings. *See Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). Furthermore, in *United States v. Rossbach,* 701 F.2d 713, 716 (8th Cir.1983), this court held that an indictment is not subject to dismissal where the government presents only the hearsay testimony of an FBI agent to the grand jury, when it is clear at the outset that the agent's testimony is based on information gathered from his investigation. Therefore, Bednar's indictment was not obtained by improper influence on the grand jury.

E. *Closing Argument*

 Bednar submits that it was error for the trial court to limit closing argument to 20 minutes per side. We disagree. The limitation of time for arguments of counsel is within the sound discretion of the trial judge. *Butler v. United States,* 317 F.2d 249, 257 (8th Cir.1963). We find no abuse of discretion occurred in this case as Bednar did not show that he was unable to fully and fairly present his case.

III. *Conclusion*

For the foregoing reasons, we affirm the conviction of Bednar on all counts.