**UNITED STATES of America, Plaintiff,**

v.

**Reico CRANSHAW, Defendant.**

**Nos. 93 C 0292, 86 CR 572–5.**

United States District Court,
N.D. Illinois, E.D.

March 25, 1993.

---

John Podliska, Susan Bogard, Asst. U.S. Attys., Chicago, IL, for plaintiff.

Reico Cranshaw, pro se.

### OPINION AND ORDER

NORGLE, District Judge:

Before the court is the motion of defendant Reico Cranshaw ("Cranshaw") to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. Not one of the issues was raised on direct appeal of his conviction. For the reasons which follow, the motion is denied.

## FACTS

Cranshaw, a member of an organization called the El Rukn, went to trial with Jeff Fort, its leader, and three other "emirs" or generals. All defendants were convicted and sentenced.

The sentences imposed were:

| | | |
|---|---|---|
| Jeff Fort | — 80 | years and a $255,000 fine; |
| Alan Knox | — 54 | years and a $229,000 fine; |
| Leon McAnderson | — 51 | years and a $241,000 fine; |
| Reico Cranshaw | — 63 | years and a $241,000 fine; |
| Roosevelt Hawkins | — 9 | years. |

---

On November 24, 1987, Cranshaw was convicted on thirty-five counts of a fifty count indictment for conspiring to commit terrorist acts in the United States on behalf of the Libyan government for money in violation of 18 U.S.C. § 371 (Count 1); travelling in interstate and foreign commerce with intent to carry out arson in violation of 18 U.S.C. §§ 2 and 1952(a)(3) (Counts 2–4, 7, 26, and 28); using interstate telephone facilities to carry out arson in violation of 18 U.S.C. §§ 2 and 1952(a)(3) (Counts 5, 6, 8–25, 27, 29, 30, 36, and 46); attempting to receive an explosive device in interstate commerce in violation of 18 U.S.C. §§ 2 and 844(d) (Count 45); and possession of unregistered firearms in violation of 26 U.S.C. §§ 5861(d) and 5871 and 18 U.S.C. § 2 (Counts 48 and 50). On December 29, 1987, Cranshaw was sentenced to sixty-three years incarceration and fined $241,000.

Cranshaw appealed his conviction to the Court of Appeals for the Seventh Circuit and his conviction was affirmed. *United States v. McAnderson,* 914 F.2d 934 (7th Cir.1990). On appeal, neither Cranshaw nor any of his co-defendants challenged the validity of the sentences imposed by this court. On or about January 7, 1993, Cranshaw filed his petition under 28 U.S.C. § 2255.

To comprehend the issues raised by Cranshaw, a review of the trial evidence is necessary. The five defendants, all members of the Chicago street gang the El Rukns, were convicted for their various roles in a conspiracy to commit terrorist acts throughout the United States in exchange for payment from the Libyan Government.

The Seventh Circuit opinion includes this background:

The El Rukn are a Chicago street gang with slightly over 100 members. The gang began in the 1960's as the Blackstone Rangers. In the 1970's, they were known as the Black P Stone Nation. In the 1980's, Jeff Fort became the undisputed leader of the gang and the organization was renamed the El Rukns, meaning 'cornerstone.' The El Rukns, under Fort, became a carefully structured enterprise. Fort, the 'Imam,' sat at the top of the hierarchy. Beneath him in descending rank were 'generals,' 'Officer Muftis,' 'ambassadors,' and 'soldiers' or 'Els.' Under Fort's leadership, the El Rukns also embraced certain elements of the Black Muslim faith. Their headquarters at 3947 South Drexel was known as the 'Mosque,' and occasional religious services, educational classes and social gatherings were held there.

In 1984, Jeff Fort began serving a lengthy sentence at the Federal Correctional Institute in Bastrop, Texas. Despite this incarceration, Fort remained the leader and mastermind of the El Rukns. Fort maintained his control over the organization via extensive telephone conversations from Bastrop to the Chicago Headquarters. In order to frustrate federal authorities who were monitoring and recording these conversations, Fort and his chief 'general,' Melvin Mayes, developed a complex code for use during these conversations.

While in prison in Bastrop, Fort learned that Louis Farrakhan had received $5 million from the Libyan government. Fort determined that at those wages, the El

Rukns should become employees of the Libyans as well. Fort decided to offer the services of the El Rukns to the Libyans. According to Fort's plan, the El Rukn would offer to perform terrorist activities within the United States in return for $1 million a year from the Libyan government. On March 11, 1986, El Rukn members Leon McAnderson and Reico Cranshaw, along with Charles Knox (an unindicted co-conspirator), travelled to Libya to meet with military officials of the Libyan government. At these meetings, Cranshaw and McAnderson presented the El Rukns' offer. Fort was informed of this meeting and began planning a way to impress the Libyans and to demonstrate the depth of the El Rukns' commitment to the enterprise. In various conversation, Fort, McAnderson, Cranshaw and others discussed destroying a government building, planting a bomb, blowing up an airplane, killing a Milwaukee alderman, or simply committing 'a killing here and there' to get the Libyans' attention. Ultimately, Fort decided that it would be more simple to take credit for other people's acts of violence. Thus, a clipping file was established to keep track of particularly violent, but as yet unsolved, crimes throughout the United States. The El Rukns would then send this file to the Libyans and take credit for the mayhem. Fort considered this effort to be 'lightweight,' and therefore also decided to make a videotape of El Rukns pretending to be from various cities around the country to impress the Libyans with the breadth of the El Rukns' membership.

The hostilities in the Gulf of Sidra between the United States military and Libyan air forces forced McAnderson, Cranshaw and Charles Knox to cancel a planned return trip to Libya in May of 1986. At Fort's instruction, the three flew instead to Panama to meet with Libyan officials at the Libyan mission thereof. In Panama, they gave the Libyans the videotape made under Fort's orders. Upon their return, customs agents searched McAnderson and Cranshaw's luggage and discovered a document written by Cranshaw vaguely describing various acts of terrorism to be performed for the Libyans.

Near the end of June 1986, Fort decided that the Libyans would only be impressed by the use of powerful explosives. He told Cranshaw and McAnderson to discuss with the Libyans the possibility of providing explosive training for the El Rukns. The true focus of Fort's plan, however, was obtaining a handheld rocket launcher or 'LAW' rocket. The LAW rocket (for 'light anti-tank weapon') was designed to destroy armored tanks. The blast of the explosive and the intense heat can melt ten to twelve inches of armor plate and can penetrate concrete bunker-type facilities. The plan to purchase this deadly weapon, however, was intercepted by the Federal Bureau of Investigation (FBI).

Ultimately, the FBI, through Special Agent Willie T. Holan and Sam Buford, an informant, contacted Alan Knox, a member of the El Rukns, and offered to sell him several LAW rockets and other military supplies. Holan had been in the process of setting up Knox for a cocaine sting, but successfully shifted gears and convinced Knox that he was also able to provide high-tech military weapons such as the LAW rocket. The weapon which Holan ultimately provided was inoperative, but appeared to contain a 'live' explosive. On July 31, 1986, Know, under instructions from Fort and Mayes, purchased the rocket for $1800. Knox, Mayes and Roosevelt Hawkins, another member of the El Rukns, met with Buford on that day and exchanged the money for the rocket. Hawkins drove and waited outside with the money while the final terms of the deal were completed. Once the purchase was made, Hawkins then drove the rocket home toward the 'Hut,' a building owned by he El Rukns at 6414–6416 South Kenwood in Chicago, but experienced car trouble and turned the rocket over to Mayes who transported it the rest of the way.

On August 5, a search of the 'Hut' was conducted pursuant to a warrant. The search uncovered the LAW rocket, as well as 32 firearms, including a MAC–10 machine gun, a full-automatic .45 caliber pistol, and a .45 caliber Commando volunteer

carbine, along with several rounds of armor-piercing bullets designed for submachine gun use.

## DISCUSSION

■ The government correctly argues that, to the extent that Cranshaw raises constitutional issues which could have been raised on direct appeal and were not, he has waived those arguments. Failure to raise constitutional challenges to a conviction on direct appeal bars a petitioner from raising the issue in a § 2255 proceeding absent a showing of good cause for, and prejudice from, the failure to appeal. *United States v. Frady,* 456 U.S. 152, 168, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816 (1982); *Williams v. United States,* 805 F.2d 1301, 1303 (7th Cir. 1986); *Norris v. United States,* 687 F.2d 899, 903–04 (7th Cir.1982).

■ In *Frady,* the Supreme Court made clear that a federal prisoner must show good "cause" for his failure to raise an issue at trial and "actual prejudice" resulting from the alleged error. *Frady,* 456 U.S. at 168, 102 S.Ct. at 1594. The Seventh Circuit has consistently emphasized that a § 2255 petition "will not be allowed to do service for an appeal." *Johnson v. United States,* 838 F.2d 201, 202 (7th Cir.1988); *see also Borre v. United States,* 940 F.2d 215, 217 (7th Cir. 1991); *Theodorou v. United States,* 887 F.2d 1336, 1339–40 (7th Cir.1989). Thus, the failure to raise a *constitutional* issue which could have been raised on direct appeal precludes review under § 2255 unless the petitioner shows both (1) good cause for his failure to pursue an issue on direct appeal and (2) actual prejudice stemming from the alleged constitutional violation. *Theodorou,* 887 F.2d at 1340. Furthermore, "*non-constitutional* errors which could have been raised on appeal but were not, are barred on collateral review—regardless of cause and prejudice." *Bontkowski v. United States,* 850 F.2d 306, 313 (7th Cir.1988) (emphasis added) (citing *Kaufman v. United States,* 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969)). Failure to establish either cause or prejudice requires dismissal of the habeas petition. *Buelow v. Dickey,* 847 F.2d 420, 425 (7th Cir.1988), *cert. denied,* 489 U.S. 1032, 109 S.Ct. 1168, 103 L.Ed.2d 227 (1989). Cranshaw has failed to carry his burden.

■ Cranshaw contends that the evidence at trial was insufficient to establish beyond a reasonable doubt that he (1) illegally transported an explosive devise in violation of 18 U.S.C. § 844(d), (2) conspired to illegally transport explosives in interstate commerce with intent to kill, injure, and intimidate individuals and unlawfully damage property in violation of 28 U.S.C. § 844(d), and (3) illegally possessed firearms via conspirational constructive possession. Sufficiency of the evidence is a non-constitutional issue and an issue that could have been raised on appeal and was not. Non-constitutional errors which could have been raised on direct appeal but were not are barred on collateral review even if the defendant establishes cause and prejudice—which Cranshaw has not. *Bontkowski v. United States,* 850 F.2d 306, 313 (7th Cir.1988).

■ Cranshaw further contends that the government "failed to make 'critical codes' available to the defense until well into trial." Cranshaw contends that as a result he was denied effective assistance of counsel, the opportunity to prepare a defense, and the ability to effectively cross-examine government witness Tramell Davis, the El Rukn codefendant who plead guilty and testified for the government. On appeal, the defendants, including Cranshaw, contended that the government failed to timely provide the defendants with decoded transcripts and that the failure hampered the defendant's ability to prepare for trial. The Court of Appeals found the allegations to be factually and legally meritless. *McAnderson,* 914 F.2d at 947. The trial court made a number of rulings after hearing the arguments of all counsel about the use of codes. Literally hundreds of hours of tape recorded conversations were turned over to Cranshaw's attorney pretrial. High level Rukns knew and used the code. Further, that the LAW rocket did not function, as argued by Cranshaw, is irrelevant to the crime of attempted receipt of an explosive devise. *United States v. Bunney,* 705 F.2d 378, 382 (10th Cir.1983); *United States v. Giordano,* 693 F.2d 245 (2nd Cir.1982); *United States v. Conway,* 507

728

F.2d 1047, 1050 (5th Cir.1975). To the extent that Cranshaw previously raised these issues on direct appeal, it has already been decided against him by the Court of Appeals and he can not raise it again in this collateral proceeding. *United States v. Mazak,* 789 F.2d 580, 581 (7th Cir.1986) (Petitioner could not raise double jeopardy claim in § 2255 motion because claim decided on direct appeal). Furthermore, to the extent that this is a constitutional issue and it was not raised on appeal Cranshaw is barred from raising the issue in this § 2255 proceeding, absent a showing of good cause for and prejudice from the failure. Cranshaw has made no showing of good cause for any such failure and no prejudice.

■ Cranshaw next contends that he received ineffective assistance of counsel at trial. He alleges that his trial counsel failed to conduct adequate investigations and failed to raise necessary issues representative of his claims. Cranshaw's claims or defenses remain vague and unspecific. These alleged deficiencies were not raised on direct appeal. Some courts have observed that it may be more appropriate to raise an ineffective assistance of counsel claim in a § 2255 petition than on direct appeal because the record can be more fully developed. *See United States v. Pope,* 841 F.2d 954, 958 (9th Cir.1988). A defendant making an ineffective assistance claim may raise the issue in the district court either in a new trial motion, *see* Fed. R.Crim.P. 33, or in a proceeding for collateral relief under 28 U.S.C. § 2255. *See United States v. Reiswitz,* 941 F.2d 488, 495 (7th Cir.1991). However, Cranshaw has made no effort in the present case to develop the record more fully. His vague and conclusory allegations of ineffective assistance are inadequate as a matter of law to raise a cognizable issue of ineffective assistance of counsel. *Richardson v. United States,* 577 F.2d 447, 452 (8th Cir.1978). As an initial matter, "the defendant must identify the specific acts or omissions of counsel that formed the basis for his claim of ineffective counsel." *United States v. Moya–Gomez,* 860 F.2d 706, 763–64 (7th Cir.1988); *see also United States v. Jackson,* 935 F.2d 832, 845 (7th Cir.1991). The burden in successfully arguing a claim for ineffective assistance of counsel is a

heavy one. *Harris v. Reed,* 894 F.2d 871, 877 (7th Cir.1990).

■ In order to prevail, Cranshaw must satisfy a two-pronged test: first, that his counsel's performance was deficient, that is, below an objective standard of reasonableness; and second, that this performance so prejudiced him as to "undermine confidence in the outcome" of the proceeding. *United States v. Hubbard,* 929 F.2d 307, 310 (7th Cir.1991) (quoting *Kubat v. Thieret,* 867 F.2d 351, 359 (7th Cir.)), *cert. denied,* —— U.S. ——, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991). The Supreme Court held in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Cranshaw's failure to specify his allegations does not meet the requirements of *Strickland.*

In his reply to the government's response, Cranshaw rehashes his original claims. He continues to argue that the evidence was not sufficient to prove his guilt beyond a reasonable doubt. However, the courts uphold the verdict of the jury if "any rational trier of fact could have found the essential elements of crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Troop,* 890 F.2d 1393, 1397 (7th Cir.1989); *United States v. Pritchard,* 745 F.2d 1112, 1122 (7th Cir.1984). Further, in vague, unsupported terms, Cranshaw attacks the prosecution for "recent exposure of prosecutorial misconduct in the treatment of government witnesses in interrelated prosecution of El

Rukn members." He makes no· claim regarding his case. Cranshaw also attacks the credibility of Trammel Davis, a key government witness in his trial. In doing so, he ignores the jury's determination of credibility and all of the other evidence introduced at trial. Cranshaw argues the government's use of Sam "Magic" Bufford, a government informant, regarding the "dummy law rocket" was outrageous. Cranshaw's assertions are without merit.

## CONCLUSION

For the foregoing reasons, the court denies Cranshaw's 28 U.S.C. § 2255 petition.

IT IS SO ORDERED.