### SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Henry W. LORIN, Eugene K. Laff, Stanley Aslanian, Jr., Capital Shares, Inc. Lawrence Caito, Toni Vallen, Rosario Russell Ruggiero, Enn Kunnapas Paul L. Miano, and Edward J. Barter, Defendants.

No. 90 Civ. 7461 (HB).

United States District Court, S.D. New York.

Feb. 28, 1995.

Thomas V. Sjoblom, Kenneth C. Vert, and Noran J. Camp, Washington, DC, for plaintiff S.E.C.

Paul K. Rooney, New York City, for defendants Capital Shares, Inc. and Lawrence Caito.

Howard Sirota, New York City, for defendant Rosario Russell Ruggiero.

## OPINION AND ORDER

BAER, District Judge.*

### I. BACKGROUND

In this action, the Securities and Exchange Commission ("SEC") has alleged numerous violations of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). The SEC seeks equitable remedies consisting of permanent injunctions and disgorgement of wrongfully obtained proceeds. The three remaining defendants in this action went to trial before me on December 5, 1994: Rosario Russell Ruggiero, Capital Shares, Inc., and Lawrence Caito, the president of Capital Shares, Inc. The SEC generally alleges that these parties acted in concert pursuant to an unwritten contractual agreement to manipulate the market for certain stocks.

■ The SEC alleges that all defendants here violated the following securities laws: (1) sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1), q(a)(2), and q(a)(3) ]; (2) section 10(b) of the Exchange Act [15 U.S.C. § 78j(b) ] and Rule 10b–5 thereunder [17 C.F.R. § 240.10b–5]; and (3) section 9(a)(2) [15 U.S.C. § 78i(a)(2) ] of the Exchange Act. Both section 17(a) of the Securities Act and section 10(b) of the Exchange Act are general antifraud provisions which prohibit any scheme to defraud in connection with the offer, purchase or sale of securities, while section 9(a)(2) of the Exchange Act prohibits manipulation of the prices of those securities listed on a national securities exchange. In addition, the SEC alleges that Caito and Capital Shares violated sections 15(c)(1) and 15(c)(2) of the Exchange Act [15 U.S.C. §§ 78o(c)(1) and (c)(2) ] (and Rules 15c1–2 [17 C.F.R. § 240.15c1–2] and 15c2–7 [17 C.F.R. § 240.15c2–7] thereunder), which generally prohibit securities fraud and manipulation by brokers and dealers, and section 17(a)(1) of

* Intern Carole Gottesman, a second-year student at New York Law School, assisted in the research and preparation of this opinion.

the Exchange Act [15 U.S.C. § 78q(a)(1)] and Rules 17a–3 and 17a–4 thereunder [17 C.F.R. §§ 240.17a–3 and 240.17a–4], which impose certain record keeping requirements. There is no dispute that the SEC's burden of proof on all of these claims is the "preponderance-of-the-evidence" standard. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983).

## II. THE ALLEGED CONTRACTUAL AGREEMENT BETWEEN THE DEFENDANTS

The SEC's allegations stem from its charge that there was an unwritten contractual agreement (the "Agreement") among the defendants (as well as the other named parties who are no longer defendants) to manipulate the prices of certain publicly traded securities, which, collectively, came to be known as the "Haas stocks" by reference to the Haas Securities Corporation ("Haas"), which also allegedly took part in the illegal activity. The alleged manipulation of the market occurred approximately between January and October 1987. The specific stocks, all of which were traded over the counter, consisted of Big O Tires, Inc., Cliff Engle Ltd., Digital Metcom, Inc., Fountain Powerboat Industries, Inc., Tunex International, Inc., Flores de New Mexico, Inc., and TS Industries, Inc. Of these stocks, Big O, Cliff, and Digital were traded on the Boston Stock Exchange.

The alleged Agreement involved the defendants "engag[ing] in manipulative activity in order to increase the prices to stabilize the prices of the stocks against normal 'market overhang' and against instances of particularly heavy selling pressure." SEC's Post–Tr. Mem. at 1. Such activity, asserts the SEC, was "designed to interfere with the free forces of supply and demand." *Id.*

Stanley Aslanian pleaded guilty on criminal charges of conspiring to manipulate the market for several of the Haas stocks. Aslanian gave deposition testimony concerning the existence of this Agreement and stated in a somewhat rambling fashion over several days that the defendants were all participants in the Agreement. The defendants do not dispute that there was such an agreement to sell these stocks at a guaranteed profit. Rather, what each defendant argues is that while the other parties knew of the Agreement's existence and acted in furtherance of it, they did not. Essentially, the remaining defendants claim to be victims, as opposed to perpetrators, of the scheme. Ruggiero's Post–Tr.Mem. at 2 ("Ruggiero was ... a victim of the scheme to manipulate the market carried out by Stanley Aslanian and others at Haas."); Capital Shares' and Caito's Prop.Find.F. & Concl.L. at 10, ¶ 49 ("Caito was not aware that Haas was manipulating the stocks. Aslanian misled Caito and others regarding his manipulation of the Haas stocks." (citation omitted)).

For the reasons that follow, the Court finds that each of the defendants knew of this Agreement and acted in accordance with it, thereby violating the various provisions of the Securities Act and the Exchange Act, and the rules promulgated thereunder, noted above.

## III. CAPITAL SHARES AND CAITO: MARKET MAKER OR MANIPULATOR?

The SEC has specifically alleged that defendant Capital Shares, a broker-dealer registered with the SEC, and Caito (as sole shareholder, President, Head Trader, and "control person" of Capital Shares) artificially increased the value of the Haas stocks, quoted excessive prices for these stocks, and effected "wash sales." The last allegation refers to a practice whereby stock is traded between parties who are related and thus no actual change in beneficial ownership occurs as a result of the sales. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 205 n. 25, 96 S.Ct. 1375, 1387 n. 25, 47 L.Ed.2d 668 (1976). This creates the illusion that the stock is being more heavily traded than is actually the case.

It is further alleged that Capital Shares and Caito were not acting as legitimate marketmakers, but rather were buying large quantities of the Haas stock pursuant to the "guaranteed profit" Agreement. Moreover, the SEC alleges that Capital Shares, in purchasing the Haas stock, was doing so as a proxy for Haas. Haas, the theory goes, was "the buyer of last resort" for *its own* stock

which Capital Shares would purchase over the counter. Capital Shares purchased $44 million of the subject stocks during 1987 and sold over $20 million of that stock right back to Haas. Ex. 51; Ex. 53–65.

Because the alleged underlying "guaranteed profit" Agreement was unwritten, the SEC's evidence of these defendants' participation in it is indirect (except for the testimony of Aslanian, who pleaded guilty and agreed to cooperate with the government). However, as will be discussed below, the law allows the Court to rely on indirect evidence to sustain a finding that defendants manipulated the market. *SEC v. Resch–Cassin & Co.*, 362 F.Supp. 964, 976 (S.D.N.Y.1973).

## A. TESTIMONY OF ROTHE

The SEC relied heavily on the expert testimony of William Rothe, the Managing Director and head of over-the-counter trading at Alex Brown & Sons and a member of the Board of Governors of the National Association of Securities Dealers Automated Quotation System. Rothe's testimony showed that Capital Share's bid quotations and transactions in the subject stock, as well as their general practices in executing these transactions, were inconsistent with those of a lawful marketmaker.

For example, Capital Shares claims that it is normal at the end of a day of trading to "recap." Capital Shares' and Caito's Prop. Find.F. & Concl.L. at 7, ¶ 30. According to Capital Shares, this means that at the end of the day, the marketmaker will contact a given broker-dealer to confirm a trade with that broker-dealer as to size, price and/or security. However, Rothe testified that the frequency with which Capital Shares "recapped" with Haas in particular was inconsistent with lawful industry practice. Trial Tr. at 842–43 (Rothe). The frequency with which the "recapping" with Haas occurred is instead consistent with the SEC's contention that Haas was acting as buyer of last resort for their *own stocks*, which Capital Shares was regularly buying in huge quantities. Moreover, Aslanian, Rothe and Carl Mark Burgess, a Haas employee during the times at issue, testified that the "recapping" was done to inform Laff and Aslanian of which

stocks Caito expected Haas to buy back pursuant to the Agreement. Ct.Ex.A at 149–52, 219 (Aslanian); Trial Tr. at 448–49 (Burgess), 792–93 (Rothe). Thus, Haas was being contacted for the purpose of confirming that it was actually going to *buy back* the stock that Capital Shares had purchased on the market. The resulting purchases made it appear as though the stock was being more heavily traded than was actually the case. This conclusion is supported by the fact that such a large portion of the Haas stocks purchased by Capital Shares was indeed subsequently sold back to Haas. For example, Capital Shares sold to Haas 96% of the Flores shares which Capital Shares bought on the market between September 16, 1987 through October 23, 1987. It is also undisputed that between July and October 1987, Caito purchased more than $44 million worth of the various Haas stocks.

## B. DISCUSSION

 Securities manipulation has been defined by the Supreme Court as conduct "designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976) (footnote omitted). The law permits the fact-finder to infer market manipulation where stock is being transferred between a few parties in the manner that took place here. *United States v. Cohen*, 518 F.2d 727, 734 (2d Cir.), *cert. denied sub nom. Duboff v. United States*, 423 U.S. 926, 96 S.Ct. 270, 46 L.Ed.2d 252 (1975); *SEC v. Kimmes*, 799 F.Supp. 852, 859 (N.D.Ill.1992), *aff'd sub nom. SEC v. Quinn*, 997 F.2d 287 (7th Cir.1993). The law also provides for an inference of market manipulation through domination and control where a broker consistently quotes bids for stock that exceed the amounts created by the demand for that stock on the open market. *SEC v. Resch–Cassin & Co.*, 362 F.Supp. 964 (S.D.N.Y.1973). In addition, section 10(b) does not require a showing of manipulative purpose; such purpose may instead be presumed upon a showing of a course of conduct that has the effect of manipulating the securities market for certain stocks. "It is suffi-

cient for the person to engage in a course of business which operates as a fraud or deceit as to the nature of the market for the security." *In re Batterman,* Release No. 34–12278, 46 S.E.C. 304, 305, 1976 WL 13757, at *2 (Mar. 29, 1976) (footnote omitted).

In the instant case, Rothe attested to the fact that the prices that Capital Shares quoted for the subject stock did not reflect what the demand for these stocks was on the open market, but rather were excessive price quotes. Trial Tr. at 760 (Rothe) (discussing the activity of "increasing quotations at such times as it did not appear to be warranted by the market or market conditions"). Quoting excessive prices has the immediate effect of artificially increasing the market value of the stock, in violation of Section 17(a) of the Act of 1933 and Section 10(b) of the Exchange Act. Due to the manipulation, the prices for the Haas stocks increased steadily during 1987 and remained stable even on "Black Monday," October 19, 1987, the date of the Wall Street crash.

## C. CAPITAL SHARES' AND CAITO'S DEFENSES

■ Capital Shares and Caito contend that they were acting as a lawful, albeit high-risk, marketmaker. They claim that, at all times, they were acting within the accepted pattern of behavior for a marketmaker. Capital Shares' and Caito's Prop.Find.F. & Concl.L. at 7, ¶ 31 ("Capital [Shares'] and Caito's marketmaking activities comported with industry standards."). For example, Capital Shares states that a great number of factors may go into the decision of which securities to purchase and in what quantities to do so. Capital Shares does concede, however, that certain of the subject stocks were "thinly traded, with a small float." Capital Shares' and Caito's Post-Tr.Mem. at 1. According to defendants, this was a rational reason to purchase the Haas stocks—that is, the potential return would be greater if the stock had been undervalued.

While this may have provided an explicable basis for Capital Shares purchasing some Haas stock, it does not explain why (1) Capital Shares would purchase $44 million worth of such risky stock and (2) why Capital

Shares would almost immediately sell back so much of the stock to Haas. Thus, if we trace the pattern of transactions made and the manner in which Capital Shares executed them, the result supports an inference that Capital Shares was acting in cooperation with Haas in furtherance of a guaranteed profit-making Agreement.

This inference is further borne out by the frequency with which Caito communicated with Haas at the end of the trading day. Testimony from Burgess, who worked at Haas during the relevant time period, shows that Caito had an ongoing relationship with Aslanian and that Caito executed trades of Haas stock on almost a daily basis. Trial Tr. at 441–46, 449–51. Between July 1987 and October 1987, Capital Shares sold over $20 million worth of stock to Haas, with over half of these sales being made after 3:00 p.m. Ex. 52.

The volume of sales late in the day lends support to the conclusion that the daily calls between Capital Shares and Haas were not to confirm trades already made or "recap" as Capital Shares claims, but to sell back to Haas shares that Capital Shares could not dispose of elsewhere pursuant to the for-profit Agreement between the parties. Put another way, Capital Shares was purchasing stock at Haas' request pursuant to the Agreement, which would guarantee a profit on the sale of the stocks.

The hub of Capital Shares and Caito's defense is that the transactions they executed were legal and that at no time did they know of a scheme to manipulate the market for the sale of the Haas stock or participate in that scheme. Capital Shares' and Caito's Prop.Find.F. & Concl.L. at 10, ¶ 48 ("Capital and Caito did not have an understanding or arrangement with Haas regarding the ... stocks...." (citations omitted)). Further, defendants argue that the SEC cannot meet its burden of proving that the defendants acted with the scienter that is required by Section 10(b) of the Exchange Act, Rule 10b–5 of that Act, and Section 17(a)(1) of the Securities Act. I disagree.

■ Scienter has been defined as a "mental state embracing intent to deceive, manip-

ulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193, 96 S.Ct. at 1381. It is well settled that proof of scienter where securities manipulation is the gravamen of the action need not be established through direct evidence. Rather, the scienter requirement is satisfied when it has been shown that defendants pursued a course of conduct that constituted market manipulation as a matter of law. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 391 n. 30, 103 S.Ct. 683, 692 n. 30, 74 L.Ed.2d 548 (1983).

In *SEC v. Kimmes*, 799 F.Supp. 852, 859 (N.D.Ill.1992), *aff'd sub nom. SEC v. Quinn*, 997 F.2d 287 (7th Cir.1993), an analogous case, the United States District Court for the Northern District of Illinois spelled out activities that have consistently supported a presumption that the given defendants acted with the intent to manipulate the market. These activities include, among others, (1) promises of profits for the sale of the subject stock (2) directed and controlled trades (3) the use of wash sales and matched orders and (4) the use of undisclosed nominees. *Id. See also United States v. Cohen*, 518 F.2d 727, 734 (2d Cir.), *cert. denied sub nom. Duboff v. United States*, 423 U.S. 926, 96 S.Ct. 270, 46 L.Ed.2d 252 (1975); *SEC v. Commonwealth Chem. Sec., Inc.*, 410 F.Supp. 1002, 1017–18 (S.D.N.Y.1976), *aff'd in part and modified in part on other grounds*, 574 F.2d 90 (2d Cir.1978).

As discussed above, testimony from Aslanian, Rothe, and Burgess, as well as the undisputed extensive purchases of Haas stock by defendants Capital Shares and Caito, support the finding of many of these factors; that is, of a for-profit Agreement between the defendants, the use of wash sales and directed trades, and the use of nominee accounts (which will be discussed more fully in the section below discussing the record keeping violations).

In a word, there is ample evidence from which to conclude that defendants acted with the requisite scienter.

### D. SEC's ALLEGATION OF INACCURATE RECORD KEEPING

■ The Exchange Act requires that a broker-dealer maintain records in accordance with Section 17(a)(1) and Rule 17a–3. These record keeping provisions require that certain information be maintained, including (1) securities positions carried by a broker-dealer for its own account and the accounts of customers, and (2) memoranda of each order for the purchase and sale of securities whether or not executed. Rule 17a–3(a)(9) of the Exchange Act requires broker-dealers to maintain records for each account, showing the name and address of the beneficial owner. *Kimmes*, 799 F.Supp. at 860. *See also United States v. Bednar*, 728 F.2d 1043, 1047 (8th Cir.1984).

Violation of the record keeping provisions is especially important in a case such as this, because it adds another string to the bow in support of an inference of market manipulation. The *Kimmes* Court, in explaining the significance of these provisions, stated that "the failure to record the nominee relationships was a material device in the [alleged] manipulation, used to conceal … the identities of the individuals with actual beneficial interests." *Kimmes*, 799 F.Supp. at 860.

The SEC alleges that Capital Shares and Caito failed to keep accurate records of the subject transactions in that they did not record the identity of the true owner of the stock; instead, they concealed that the stock that Capital Shares "purchased" from Haas continued to be beneficially owned by Haas. That is, Capital Shares purchased the stock from Haas with the intention of immediately selling it back to Haas and with a guarantee of profits from Haas. This practice of nondisclosure of the true owner-in-interest violates Rule 17a–3(a)(9) of Section 17(a) of the Exchange Act.

### IV. ROSARIO RUSSELL RUGGIERO

The SEC has alleged that while Ruggiero was a broker at E.F. Hutton & Co., Inc., and later when he was a broker at Haas, he engaged in practices which constituted stock market "domination and control," in contravention of section 17(a) of the Securities Act and section 10(b) of the Exchange Act and Rule 10b–5 thereunder. It is further alleged that Ruggiero was a participant in the

scheme to manipulate the market for the Haas stocks from July 1987 through October 1987.

In support of these allegations, Aslanian gave deposition testimony that Ruggiero was a knowing participant in the scheme. The SEC also offered factual evidence from which it may be inferred that Ruggiero knowingly participated in the scheme. For example, Ruggiero effected sales of a large amount of Haas stock while he was a broker at E.F. Hutton. The evidence showed that Ruggiero purchased Haas stocks for some of his customers' accounts, and that he sometimes did so without the approval of the customers. Indeed, the SEC offered evidence indicating that the reason Ruggiero began working for Haas was that E.F. Hutton no longer allowed him to purchase Haas stock. Ruggiero did admit that E.F. Hutton officials wanted to limit his trading in the Haas stocks. Trial Tr. 1224–25 (Ruggiero).

There is also evidence that Ruggiero, while advising his clients otherwise, believed that the Haas stock was being overvalued. Ruggiero testified that he was fully familiar with an article published in *Barron's* on March 14, 1987, entitled "Abracadabra Man," SEC's Ex. 2, which was highly critical of Haas stock and suggested that the stock's price was being inflated. In fact, Ruggiero also stated that he circulated the article to his customers. Trial Tr. 1170 (Ruggiero). When Irwin Dublirer, Ruggiero's branch manager at E.F. Hutton, expressed doubts about the worth of the Haas stocks, Ruggiero told him, "everybody knows that these are garbage stocks and I sent this article to all my clients. They are aware of this article." Trial Tr. 208 (Dublirer (quoting Ruggiero)). Two of Ruggiero's clients, however, testified in depositions that they never received the article. Ex. 174 (Savino); Ex. 166 (Lewis). Ruggiero further failed to tell his clients that E.F. Hutton had restricted his trading in the Haas stocks. Trial Tr. 177 (Sutton). Despite Ruggiero's own admission that he believed the Haas stocks were "garbage," and knowing that officials in E.F. Hutton's compliance department had restricted his trading in these stocks, Ruggiero continued to purchase

millions of dollars worth of the stock for his customers. Ex. 135.

## A. ELIZABETH RUGGIERO'S HAAS ACCOUNT

Ruggiero opened up an account in the name of his wife, Elizabeth Ruggiero, in June 1987. The account initially was invested with Ruggiero's bonus from E.F. Hutton, and was used to purchase Haas stock. For example, on June 4th, 8,000 shares of TS stock was purchased through the account at $19-¾ per share. Ct.Ex.A at 95–97 (Aslanian). It is significant that the market price for that same stock immediately prior to the sale to Mrs. Ruggiero's account was $21-¾ per share. This "purchase" at $16,000 below the market price evidences the relationship between Ruggiero and Aslanian in that this was the manner in which Ruggiero was "paid" for his efforts in the market manipulation. *Id.* at 95–101 (Aslanian). It is also indicative of the modus operandi of the Agreement, whereby accounts did not reflect the identity of the beneficial owner of the Haas stock. From all of these facts, it can be inferred that these parties were acting in concert to manipulate the market for these stocks.

Ruggiero summarily denies any wrongdoing and specifically denies participation in the scheme. In the alternative, he contends that he was merely an aider and abettor and not a primary violator of the securities laws. Like Capital Shares and Caito, Ruggiero argues that he lacked the requisite scienter to establish that he manipulated the market for Haas stocks.

## B. DISCUSSION—RUGGIERO

█ There is ample evidence from which to infer that Ruggiero acted to manipulate the market for Haas stocks. He advised his clients to purchase Haas stock even though he had previously acknowledged that the stock was overvalued. He opened an account in his wife's name to purchase Haas stocks, and designated Aslanian as an account executive even though this deprived himself of commissions on the trades. Trial Tr. at 1130 (E. Ruggiero). There was testimony from former customers that Ruggiero purchased Haas stock for them without prior authoriza-

tion. Such conduct also supports an inference that he had an agreement to buy the Haas stock and, in order not to disclose the beneficial interest, used nominee accounts. Ruggiero's transactions during the period of the alleged Agreement support an inference that he acted pursuant to the Agreement. For example, on July 20 Ruggiero sold 55,000 shares of TS stock at a cost of nearly $1.7 million from Frank Steinberger's account at E.F. Hutton. Aslanian repurchased the stock on that date in Steinberger's account. Prior to this, Ruggiero planned for the transfer of $725,000 from Steinberger's E.F. Hutton account to his Haas account. SEC's Exhibits 179, 181.

These actions support Aslanian's testimony that in early July he and Ruggiero met at a restaurant and discussed the sale of TS stock. Ruggiero does not dispute that they discussed the sale of TS stock at this meeting. According to Aslanian, Ruggiero agreed to sell shares of TS stock held in his customers accounts at E.F. Hutton. Ct.Ex.A at 110–13 (Aslanian). This was pursuant to an agreement between the defendants to effect a "short squeeze" of the TS stock. By Ruggiero removing these shares, E.F. Hutton would not be able to settle its obligations to buyers of the TS stock, to whom it had sold the stock "short." By buying up the TS stock, Ruggiero and the other defendants thus inflated the price of the TS stock. E.F. Hutton would have to purchase at the higher price to cover its obligations. Taken together, these actions on the part of Ruggiero belie his claim that he was not a knowing participant in the scheme to manipulate the market for the Haas stocks.

However, even in the absence of these inferences, the law allows a showing of recklessness to meet the scienter requirement for violations of section 17(a) of the Securities Act and section 10(b) of the Exchange Act. *Oleck v. Fischer,* 623 F.2d 791, 794 (2d Cir. 1980); *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1306 (2d Cir.1973) (en banc). While the Court finds ample evidence to conclude that Ruggiero was a primary violator of these sections, it is certainly established that he acted recklessly in advising his clients to purchase the Haas stocks and in buying the Haas stocks for their accounts without authorization. As discussed above, by his own admission, Ruggiero was aware that the stocks were overvalued, yet repeatedly compromised his customers' positions in pursuit of the guaranteed-profit Agreement. This recklessness was a breach of his duty to his customers and supports the scienter requirement of Section 17(a) of the Act of 1933 and Section 10(b) of the Exchange Act.

## V. CONCLUSION

Based on the trial evidence and the law above, I find that, as alleged, all defendants violated sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, section 10(b) of the Exchange Act and Rule 10b–5 thereunder, and section 9(a)(2) of the Exchange Act. I also find that Caito and Capital Shares violated sections 15(c)(1) and 15(c)(2) of the Exchange Act and Rules 15c1–2 and 15c2–7 thereunder, and section 17(a)(1) of the Exchange Act and Rules 17a–3 and 17a–4 thereunder.

### A. DISGORGEMENT

■ Disgorgement is an equitable remedy that does not compensate investors but rather is "designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." *SEC v. First City Fin. Corp., Ltd.,* 890 F.2d 1215, 1230 (D.C.Cir.1989) (citations omitted). *See also SEC v. Materia,* 745 F.2d 197, 201 (2d Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985); *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1104 (2d Cir.1972) ("The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable."). In view of the fact that the Court has found Capital Shares, Caito, and Ruggiero to have violated Sections 17(a) of the Act of 1933 and Section 10(b) of the Exchange Act, disgorgement is an appropriate remedy to preclude the unjust enrichment of these defendants, as well as to serve both specific and general deterrence purposes.

■ The law provides that the amount of disgorgement ordered "need only be a reasonable approximation of profits . causally

connected to the violation." *First City Financial Corp.*, 890 F.2d at 1231. The underlying policy is that a wrongdoer violates the securities laws at his or her own peril. It is therefore not an issue that some of the funds ordered to be disgorged might actually have been derived from lawful trades. *See, e.g., SEC v. MacDonald,* 699 F.2d 47, 55 (1st Cir.1983); *Elkind v. Ligget & Myers, Inc.,* 635 F.2d 156, 171 (2d Cir.1980). In the face of such a vast number of trades that were made in furtherance of manipulation of the market, it is difficult to ascertain precisely the amount of money that is subject to disgorgement. There is, however, sufficient evidence to support a finding that Capital Shares should be ordered to disgorge $983,-867.00. This sum reflects profits made by Capital Shares from the trading of Flores stock from March 1, 1987 through October 28, 1987, and from trading Big O, Cliff, Fountain and TS stocks from July 1, 1987 through October 28, 1987. Exhibit 101. Ruggiero is ordered to disgorge $72,000.00, which sum represents the commissions he received from trading in various Haas stocks while at E.F. Hutton. Exhibit 127.

 The SEC has requested that pre-judgment interest be applied to the sums owed by Capital Shares, Caito, and Ruggiero. Pre-judgment interest, like the remedy of disgorgement itself, is meant to deprive wrongdoers of the fruits of their ill-gotten gains from violating securities laws. It is in the Court's discretion to award pre-judgment interest on the disgorged funds. *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 637 F.2d 77, 86 (2d Cir.1980); *SEC v. Stephenson,* 732 F.Supp. 438, 439 (S.D.N.Y.1990). Consequently, the Court finds that the awarding of pre-judgment interest is an appropriate remedy and will be ordered against Capital Shares, Caito, and Ruggiero.

The calculation of pre-judgment interest follows the delinquent tax rate determined by the Internal Revenue Service, Internal Revenue Code, Section 6621(a)(2) [26 U.S.C. § 6621(a)(2) ], and is assessed on a quarterly basis. According to these calculations, the Court orders that the pre-judgment interest to be paid by Capital Shares and Caito is $937,223.00. For Ruggiero, the interest to be paid on the disgorged funds is $67,481.00.

## B. INJUNCTIVE RELIEF

 It is in the discretion of the Court to grant a permanent injunction against violators of securities laws where there is a reasonable likelihood that the wrong will be repeated. *Manor Nursing Homes,* 458 F.2d 1082, at 1100 (2d Cir.1972); *accord SEC v. Commonwealth Chem. Sec., Inc.,* 574 F.2d 90, 99 (2d Cir.1978). Factors that the court may consider in determining the likelihood of future wrongs include the egregiousness of the violations, isolated or recurrent nature of the violations, defendant's recognition of the wrongful nature of his or her conduct, and the likelihood that defendant's occupation will present opportunities for future violations. *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807–08 (2d Cir.1975); *SEC v. Spectrum, Ltd.,* 489 F.2d 535, 542 (2d Cir.1973); *SEC v. First City Fin. Corp., Ltd.,* 890 F.2d 1215, 1228 (D.C.Cir.1989) ("No single factor is determinative; instead, the district court should determine the propensity for future violations based on the totality of the circumstances." (citations omitted)).

 Neither Capital Shares, through Caito, nor Ruggiero have admitted any wrongdoing in relation to the allegations. This makes it rather dubious that they are likely to avoid such violations of the securities laws in the future. Further, both Caito and Ruggiero still trade securities. This presents an easy opportunity for future wrongdoing. Where "the same circumstances ... with the same enticements may well crop up again.... the admonition of an injunction" is appropriate. *SEC v. Shapiro,* 494 F.2d 1301, 1308 (2d Cir.1974).

Moreover, the egregiousness of the offenses and the frequency with which they were executed belies any notion that the violations were isolated. For example, Ruggiero, breaching his fiduciary duties to his customers pursuant to the Agreement, caused his customers' accounts at E.F. Hutton to have a negative net worth of $1.8 million by November 1987, just after the collapse of the scheme. Ex. 125. These

defendants engaged in manipulative practices almost daily between the period of March 1987 through October 1987 (Ruggiero since at least July 1987). Therefore, in view of all of these factors, which indicate a likelihood that the defendants will engage in further violations of the securities laws if not enjoined, a permanent injunction is hereby ordered against Caito and Ruggiero.

**SO ORDERED.**