**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Frederick Augustus MORAN, Frederick Winston Moran, Moran Asset Management Inc., and Moran & Associates, Inc., Securities Brokerage, Defendants.**

**No. 95 Civ. 4472 (BN).**

United States District Court, S.D. New York.

Nov. 1, 1996.

United States Securities and Exchange Commission (Mark Kreitman, Richard E. Simpson, Ann H. Sulzberg, of counsel), Washington, DC, for Plaintiff.

Kelley Drye & Warren (Robert A. Horowitz, Karen Y. Bitar, of counsel), Stamford, CT, for Defendants Frederick Augustus Moran, Moran Asset Management Inc., and Moran & Associates, Inc., Securities Brokerage.

### OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge: [1]

This matter represents the penalty phase of the civil securities fraud enforcement action brought against Frederick Augustus Moran ("Moran Sr."), Frederick Winston Moran ("Moran Jr."), Moran Asset Management Inc. ("Moran Asset"), and Moran & Associates, Inc., Securities Brokerage ("Moran Brokerage"). In a previous decision, the court dismissed the insider trading claims brought against each of the defendants, but found Moran Sr., Moran Asset, and Moran Brokerage liable for other violations of federal securities laws. *SEC v. Moran*, 922 F.Supp. 867, 900–02 (S.D.N.Y.1996) ("*Moran I*"). Moran Sr. and Moran Asset were found liable for violating §§ 206(2), 204, and 207 of the Investment Advisors Act of 1940 in addition to Rule 204–1(b)(1). Moran Sr. and Moran Brokerage were found liable for vio-

---

**1.** Bernard Newman, Senior Judge of the United States Court of International Trade, sitting as United States District Judge by designation.

lating § 15(b) of the Securities and Exchange Act of 1934 and Rule 15b3–1 thereunder.

Pursuant to the court's order of October 30, 1995 and with the consent of all parties, the court bifurcated the liability phase of the case from the penalty phase. Accordingly, the sole issue presented to the court at this juncture is fashioning an appropriate penalty for the violations. Additional evidence was presented to the court on July 18, 1996. In conformity with F.R.C.P. Rule 52(a), the following constitutes the court's findings of fact and conclusions of law.

## THE RECORD[2]

Defendants presented two witnesses: defendant Frederick Augustus Moran, president of Moran Asset and Moran Brokerage and Richard G. Brodrick, partner of Kelley Drye & Warren who practices in the general area of corporate law with a sub-specialty of representing brokerage and investment advisor firms. Plaintiff offered one witness, Daniel Wong, a supervisory securities compliance examiner for the Securities and Exchange Commission.[3]

## CONTENTION OF THE PARTIES

Plaintiff asks the court to enjoin each defendant from any further violation of the specific laws under which they have been found liable. Further, plaintiff requests that the court order Moran Sr. to disgorge $9551 plus prejudgment interest which it claims constitutes the amount of money lost by defendants' investors as a result of the violation of section 206(2) of the Adviser's Act. Finally, plaintiff seeks the imposition of civil penalties, pursuant to sections 21(d)(3) and 209(3) of the Exchange and Advisers Acts respectively, in the amount of $175,000. Specifically, plaintiff argues that Moran Sr.'s violation of six separate statutory and rule violations warrants the imposition of penalties totaling $100,000 against him personally. In addition, plaintiff contends that Moran Asset and Moran Brokerage should be assessed penalties in the amounts of $50,000 and $25,-000 respectively for their violations.

Defendants respond that the plaintiff's demand constitutes an unfair burden placed upon them. While Moran Sr. concedes that he should reimburse his clients who lost money as a result of his illegal acts, defendants maintain that reimbursement alone is an adequate remedy. Defendants submit that because their acts were not perpetrated with any malevolent intent, that they have already suffered both mentally and economically, and that they pose no further threat to the investment community as a whole, and consequently the court should not award any civil penalties or injunctive relief.

## ADDITIONAL FACTUAL FINDINGS[4]

Moran Sr. is the president and principal portfolio manager of Moran Asset as well as the president and director of research for Moran Brokerage. Moran Sr. has never been convicted of a crime or previously found in violation of federal securities laws. Prior to this action, neither Moran Sr. nor any of his firms had been named as defendants where civil fraud was alleged. The court makes the following findings regarding Moran Sr.'s claims.

### Moran Sr.'s Losses

The court finds that Moran Sr. and his firms have unquestionably suffered large financial losses. In making this determination, the court finds Moran Sr.'s testimony regarding the amount of losses and effect on his two businesses to be credible. Moran Sr. testified that he has suffered great losses as a result of what he termed as the SEC's "vendetta" against him (R. 113). Specifically, he recounted to the court that in October, 1993 Moran Asset and Moran Brokerage had been earning $300 million and $2.5 million respectively. Today, Moran Sr. estimated

---

**2.** By agreement of the parties, defendants presented their evidence first.

**3.** All of Wong's testimony regarding an audit report made of Moran Sr.'s firms prior to October 1993 was stricken from the record and the audit report itself was not admitted into evidence. No consideration was given to either the

report or stricken testimony in the formulation of this opinion.

**4.** The court hereby incorporates into this decision all Findings of Fact and Conclusions of Law made in its April 2, 1996 decision.

the firms' business as $5 million and $350,-000. Further, Moran Sr. states that underwriting decreased after the investigation.

In addition to major financial losses, Moran Sr. testified that he believed that he would likely be disqualified from the National Association of Securities Dealers ("NASD"). Although Moran Sr. conceded on cross-examination that the disqualification is potentially appealable, because of his financial situation as a result of this case, Moran Sr. claimed that he would be unable to pursue an appeal[5]. Moran Sr. asserted that his business was further damaged because he and his employees were so distracted during the course of the SEC investigation that they were not able to meet the needs of his remaining clients. With respect to his employees, Moran Sr. represented that his total number of employees has been reduced from twenty-six in October 1993 to the current number of four. Finally, Moran Sr. indicated that his intention was to close Moran Brokerage because of the losses sustained in the business[6]. In short, the court accepts Moran Sr.'s representations that his businesses have suffered a great deal as a result of this action.

### The SEC's Investigation

■ Moran Sr. alleges that the SEC somehow acted improperly by virtue of the way this case was litigated. Specifically, Moran Sr. argues that the SEC harassed his staff and family, refused to "respond rationally" (R. 40), and pursued a "vendetta" against him The court rejects Moran Sr.'s analysis. The evidence reveals clearly and unequivocally that the SEC acted well within legal and appropriate bounds.

In support of Moran Sr.'s claim, Richard G. Brodrick, an attorney at the firm retained by Moran Sr., testified that the SEC acted in an unusual manner by not disclosing audit reports and launching a second inquiry after the an insider trading investigation had be-

gun. While the court does not doubt the sincerity, credibility, and experience of Brodrick, it finds his testimony to shed little light on this matter. Initially, Brodrick is hardly a disinterested witness. In addition to being a partner at the firm representing · Moran Sr., he was an officer of Moran Asset. More problematic however, is Brodrick's statement that he "didn't really know a bunch about what had happened at Moran Asset Management" (R.65). Considering his lack of specific knowledge of the current situation, it is difficult to accept Brodrick's assertion that the SEC acted in an unusual manner.

The court further disagrees with Moran Sr.'s assessment that the SEC acted inappropriately in conducting its investigation and pursuing its claims. Moran Sr., himself, concedes that he believed "that the SEC's investigation was the proper thing to do. The coincidence of events that occurred with my son and I in our situation, as Bob Horowitz said, cried out for an investigation, and it was very appropriate that they did that" (R. 117). Therefore, by all accounts, the SEC properly initiated its investigation. Moran Sr. complains that the SEC then went too far. Based on the record before the court, there is no evidence to support this claim.

Without a doubt, an SEC investigation is generally a long and often arduous process; it is nonetheless necessary when suspicions of wrongdoing abound. Moran Sr. maintains that the SEC disrupted his business. In particular, he states:

> We totally lost our concentration. We couldn't function. The amount of time it took preparing and providing endless thousands, literally thousands of documents, everybody wondering when they were going to come walking into our office again and arrest us or do who knows what. It was just a nightmare for everybody and

---

**5.** Moran Sr. testified that without including the legal costs of the penalty phase of the trial, he had incurred $786,000 in legal fees.

**6.** Whether Moran Sr. is going to close his business is a point which is hotly contested by each side. In conformity with the court's October 8, 1996 order, the court will only consider the evidence that was presented within this record.

Accordingly, the undisputed evidence within the record is that, notwithstanding Moran Sr.'s statement of intention, both Moran Asset and Moran Brokerage remain operational. Thus, for purposes of this opinion, the court will not speculate as to the future of either Moran Asset or Moran Brokerage.

people were just resigning left and right, just trying to get away from it.

(R. 26). As previously noted, the investigation surely had a negative impact on Moran Sr.'s business, but such an effect does not render the investigation unjustified. Naturally, the SEC deposed Moran Sr.'s employees and requested numerous documents. The court is puzzled as to what Moran Sr. believes the SEC should have been doing. Similarly, employees of Bell Atlantic and Salomon Brothers would necessarily be deposed so the SEC could discover what information was non-public and what guidelines existed regarding disclosure. Considering the effect and outcome of the investigations, the court understands Moran Sr.'s feelings towards the SEC, but plainly the evidence does not demonstrate any impropriety.

Moran Sr. also complains that the SEC deposed his family members. Surely, the involvement of any person's family into an investigation such as the one undertaken is painful and unpleasant. However, simply because something is distasteful does not render it unnecessary. In this case, one of Moran Sr.'s sons was believed to be involved in illegal activity. Further, Moran Sr.'s two eldest sons and wife were the named directors of his firms, a fact that was very relevant to the investigation. Again, while the involvement of outside individuals in any investigation of this nature is sure to create heartache, the court sees no evidence to support Moran Sr.'s claim that the SEC engaged in any improper activity. Moran Sr.'s family potentially had information which might have shed light upon the matters before the SEC.

Moran Sr.'s final reason for asking the court for leniency is that he believes that the SEC would not listen to reason and is pursuing a "vendetta" against him. The court finds Moran Sr.'s claims to be completely unsupported by the facts. Moran Sr., on several occasions during the course of the trial, stated that he believed the SEC "was trying to destroy me, my business and my son and his business activities" (R. 39). With respect to the insider trading investigation,

Moran Sr. stated that he believed the SEC was trying to destroy him:

> Because the evidence was so overwhelming, so rational and clear and obvious to any reasonable person and I thought when this was presented to them, they would respond rationally. They never came up with any evidence ... that even suggested we had done anything improperly and all the evidence was one way and it became clear to me that whatever they determined in their investigation, whatever they found out would make no difference whatsoever. They would just proceed against us. The investigation was just a way of them trying to build up whatever they could come up with, but whatever was discovered and determined would have no effect on their course of action. It was predetermined from the beginning.

(R. 40–41). Moran Sr. expressed similar views regarding the compliance investigation. Specifically he stated: "It just was not a rational course of action and there's no other explanation in my mind except they were out to destroy me" (R. 42). The court rejects Moran Sr.'s contentions.

Although the court dismissed the insider trading claims against all defendants in this action, it nonetheless noted that "[s]urely one possible inference that can reasonably be drawn from the evidence presented in this case is that Moran Sr. purchased cable security stocks based on material non-public information provided to him by Moran Jr." *Moran I*, 922 F.Supp. at 892. Moreover, the court additionally found that "[t]he evidence, in part, leaves no question that the details disclosed by Moran Jr. were material, nonpublic, and confidential information." *Id.* at 895[7]. Thus, while the insider trading claims were not proved by a preponderance of the evidence, because there was evidence to suggest a reasonable possibility that Moran Sr. engaged in insider trading along with proof that Moran Jr. disclosed material non-public information, it strains credulity to the breaking point for Moran Sr. to suggest that there was no evidence "that even suggested" he had engaged in illegal conduct. On the con-

---

**7.** As noted in the court's prior opinion, there was no trading based on the disclosure of this infor-

mation, and consequently there was no violation of the Exchange Act.

trary, the SEC had a good faith basis to pursue those charges despite ultimately losing that issue at trial.

With respect to the second investigation, the court can think of no stronger indictment of Moran Sr.'s belief of vendetta than the fact that Moran Sr. was found to be liable for six separate violations of Federal Securities laws. It is difficult to imagine a more powerful justification for any investigation than the target of the investigation being found liable. Far from demonstrating bad faith, the SEC proved its case to the court.

Finally, the reason articulated by Moran Sr. for this alleged attack by the SEC is not compelling. Moran Sr. stated that he had "spoken out about the SEC's behavior in the past, and I believe that is why the SEC has had this vendetta against me" (R. 152)[8]. In making this accusation, Moran Sr. ignores the evidence produced in this case and the fact that this lawsuit against him was only one of three actions brought by the SEC growing out of the same merger activity. Although Moran Sr. acknowledged that he was aware of the other two cases, he stated that as time passed "my view that a vendetta was against me exists, continues, and became stronger" (R. 113). For all of the foregoing reasons, the court rejects Moran Sr.'s arguments that the SEC has acted improperly or is specifically pursuing a vendetta against him or his companies.

### Moran Sr.'s Acceptance of Responsibility

■ While Moran Sr. stated "I recognize and accept responsibility for these mistakes, and I am very sorry that they occurred," his other testimony, statements to the press, and subsequent actions belie those words. The record demonstrates quite clearly that Moran Sr. does not recognize the seriousness of the violations he committed and certainly does not view himself to be at fault. Therefore the court rejects Moran Sr.'s statement purportedly accepting responsibility for his actions.

With respect to how the violations occurred, Moran Sr. explained that the omission occurred because "someone else in my firm whose job was to fill those forms out didn't perform their job properly" (R. 82–83). Even when he attempts to shift the blame to his employee, Moran's culpable conduct becomes apparent. Moran Sr. stated that he terminated the employee because "he continued to make errors in the ADV and BD preparation, despite the fact that I had admonished him again and again" (R. 83). Taking this statement in the best light for Moran Sr., the conclusion is inescapable that he knew his employee was incapable of filling out these forms properly and yet he allowed the employee to continue and filed the forms, under penalty of perjury, without checking their accuracy. Yet, Moran Sr. never satisfactorily explained why he allowed misrepresentations to continue.

Moran Sr. has also attempted to trivialize his violations of law. With respect to section 206(2) of the Advisor's Act, he has taken the position that he did not defraud his clients, that his actions were negligent. By adopting this view, Moran Sr. illustrates that he either does not recognize the nature of his actions or is intentionally minimizing his illegal conduct. The court specifically found that Moran Sr. violated section 206(2) prohibiting any action "which operates as a *fraud* or deceit upon any client or prospective client." 15 U.S.C. § 80b–6(2) (emphasis added). By the very terms of the statute Moran Sr. violated, his actions constituted a "fraud." Moran Sr.'s refusal to recognize his conduct as such indicates that he does not accept the nature of his actions.

The refusal to recognize the nature and seriousness of his violations was also demonstrated by his statements memorialized in newspaper articles[9]. Specifically, Moran Sr. described the violations as "compliance items that are not significant" and "administrative nonsense." Exhibits FG and FH. Moran Sr. seeks to minimize the nature of these

8. Although Moran Sr. by his statement presumably "spoke out" publicly against the SEC, he offered no evidence of ever doing so prior to this case.

9. The parties stipulated that "Mr. Moran said to the Wall Street Journal and the New York Times the quotes that are attributed to him in those two newspapers in the context of what he is going to describe today to the Court" (R. 101–102).

comments by testifying that he made those statements:

> Because I had just been through the most trying ordeal of my life for years and had watched my family members, my employees and myself go through great suffering. We stood by our convictions, we battled against a force that we were helpless to deal with, with their unlimited moneys and power. And finally we won and the truth came out, and now the SEC was going to even take that from me.

(R. 104–05). The court realizes that in the face of having the insider trading charges dismissed anyone would understandably feel a sense of euphoria and be subject to hyperbole. The disturbing feature of Moran Sr.'s explanation, however, is that he does not accept responsibility, but blames the SEC for his public statements. Certainly, it was Moran Sr.'s conduct and not any SEC action that caused him to violate federal securities laws. For Moran Sr. to blame the SEC for his words to the press demonstrates his continuing pattern of blaming others rather than accept responsibility for his own conduct.

The court is further troubled by the fact that Moran Sr. was several thousand dollars in error as to the amount of money that his clients lost as a result of his violation. At both the liability and penalty phases of the trial, Moran Sr. has maintained that the losses sustained by his clients amounted to approximately seven thousand dollars. In point of fact, the amount of losses sustained is $9551.17 [10]. Contrary to the claims of the SEC, the court in no way believes that Moran Sr. was attempting to intentionally misrepresent the amount of money his clients had to pay as a result of Moran Sr.'s negligence. The court, however, is concerned that Moran Sr. was unaware of the actual amount his clients lost. While he stated numerous times that he was willing to reimburse those clients who lost money, Moran Sr. apparently made no effort to ascertain precisely how much money that his clients were entitled to. Such disinterest, once again, belies Moran Sr.'s

statement that he understands the gravity of the violations for which he is liable.

Finally, the court is dismayed at who Moran Sr. views as ultimately blameworthy for the predicament in which he finds himself. Rather than accept that it was his own culpable conduct that now has him before this court, Moran Sr. chooses to blame others. Specifically he points to his employees, despite his status as a control person, he minimizes his actions claiming that what he did was not harmful, and he blatantly blames the SEC for all of the hardship he has had to endure.

Indeed, when given the opportunity to add any points to his testimony Moran Sr., in part, stated:

> I don't understand how people at the SEC can even be pursuing these remedies against me asking for an injunction and $175,000. Haven't they taken enough from us at this point? I just don't understand. Where do these people come from? Enough suffering is enough. What more do they have to extract from my family and I?

(R. 109). Moran Sr. then addressed the particular SEC lawyers involved in this case saying that he sees "these people passing me in the hall and they look away from me, they are afraid to look me in the eye. Maybe they do have some guilt for what they have done to us. I hope so. I really feel badly for them that they have no remorse" (R. 110). It appears to the court that at every turn Moran Sr. has engaged in conduct or made statements indicating that he does not consider himself responsible for his own conduct, does not understand the serious nature of his actions, and is seeking to lay blame on virtually everyone else. Accordingly, in light of the foregoing evidence, the court cannot accept Moran Sr.'s blanket acceptance of responsibility.

## CONCLUSIONS OF LAW[11]

At this stage of the proceedings, the court is faced with three issues which require reso-

---

**10.** The parties stipulated to this amount on August 5, 1996.

**11.** The court hereby adopts all previous conclusions of law regarding this case and any conclusion contained within this section that also con-

lution. Having found that Moran Sr., Moran Asset, and Moran Brokerage engaged in conduct which constituted violations of three sections of the Investment Advisers Act, one section of the Securities and Exchange Act of 1934, and two Commission Rules promulgated under those sections, the court must now determine the appropriate penalty. The SEC asks the court to enjoin the defendants from any further violations, order disgorgement of illegally obtained profits, and assess civil penalties. The court will address each request in turn.

## A.

Pursuant to Section 21(d) of the Exchange Act and Section 209(d) of the Advisers Act, the court is empowered to order injunctive relief "upon a proper showing." When determining such a showing, the court is vested with wide discretion to determine when an injunction is appropriate. *SEC v. Universal Major Industries Corp.*, 546 F.2d 1044, 1048 (2d Cir.1976). Among the factors to be considered by the court in deciding whether to grant injunctive relief are:

> the degree of scienter involved, the sincerity of defendant's assurances against future violations, the isolated or recurrent nature of the infraction, defendant's recognition of the wrongful nature of his conduct, and the likelihood, because of defendant's professional occupation, that future violations might occur.

*Id.; see also, SEC v. Tome*, 833 F.2d 1086, 1095 (2d Cir.1987); *SEC v. Drexel Burnham Lambert Inc.*, 837 F.Supp. 587, 611 (S.D.N.Y. 1993), *aff'd, SEC v. Posner*, 16 F.3d 520, 522 (2d Cir.1994). Based upon a review of the entire record, the court finds that injunctive relief is appropriate in this case.

Fundamentally the violation of Section 206(2) constitutes negligence and was not intentional, however, the court is not convinced that such a violation is incapable of repetition. Moran Sr.'s tendency to blame others for his problems, his failure to recognize the amount his clients lost by virtue of his negligence, his statement that he believed no one was hurt despite the loss of nearly $10,000 of his clients money, and the inexplicable fact that he required his clients to buy the stock at a higher price when he could have easily transferred shares of stock from his personal account to his clients, all demonstrate a business practice indicating a lack of vigilance. Such laxness cannot be tolerated in the securities field. *SEC v. Lorin*, 877 F.Supp. 192, 201 (S.D.N.Y.1995) (injunction appropriate where same circumstances may be repeated). Further, Moran Sr.'s failure to recognize the serious nature of his violation does not assure the court that such errors will not happen again. Accordingly, to ensure that any potential future clients are protected, the court finds it necessary to enjoin Moran Sr. and Moran Asset against any future violations of Section 206(2) of the Advisor's Act.

The defendants' violations regarding the Forms ADV and BD similarly warrant injunctive relief. As the court noted in its previous decision, Moran Sr. has understated the importance of the information omitted and over-simplified the description of the forms. *Moran I*, 922 F.Supp. at 899. More, rather than negligence, the evidence demonstrated "that Moran Sr. acted with knowledge and intended to conceal that his sons were directors." *Id.* at 900. In addition to the previously mentioned reasons which warrant injunctive relief for these violations as well, the defendants' filing violations continued over a period of more than two years. While Moran Sr. contends that his conduct was not intentional, he offers no explanation as to why the violations continued for such a long period of time, why other documents likewise contained the same misrepresentations [12], and how the inaccuracies were cured with respect to Moran Sr.'s wife but not his sons. Incredibly, even in their filings with the court, defendants state that "Moran Sr. believes it would have been wholly inappropriate to reference his sons as directors when neither played any role whatsoever in the

---

stitutes a factual determination should be deemed a finding of fact.

12. Moran Sr. falsely stated in a Schedule 13D, filed on December 11, 1992, that he was the *sole* stockholder and director of both companies. *Moran I*, 922 F.Supp. at 901.

operations or management of the firms." Defendant's Post–Trial Brief, p. 12. Accordingly, based on the totality of circumstances, the court finds that Moran Sr., Moran Asset, and Moran Brokerage should be permanently enjoined from violating each of the statutes and Rules for which they were found to be liable.

## B.

The SEC seeks disgorgement from Moran Sr. for the illegal profit he made as a result of his violation of Section 206(2) of the Advisers Act. Disgorgement is "designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1230 (D.C.Cir. 1989). As heretofore noted, "the effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable." *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972). There is no doubt that Moran Sr. made a profit at his client's expense when he negligently purchased stock for his personal accounts before buying the same stock for all of his clients. Accordingly, disgorgement is entirely appropriate in this case. It is noteworthy that even Moran Sr., in his post trial brief and reply, does not contest the disgorgement request made by the SEC.

The parties have stipulated that the difference between the cost incurred by Moran Sr.'s clients and the cost incurred by Moran Sr.'s personal and family accounts for the Liberty shares amounts to $9551.17. Hence, the court will order disgorgement in that amount, which represents profits made by Moran Sr. at the expense of his clients. The court, in its discretion, will further order payment of prejudgment interest. *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 637 F.2d 77, 86 (2d Cir.1980); *SEC v. Stephenson*, 732 F.Supp. 438, 439 (S.D.N.Y.1990). Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity. The calculation of interest is to be calculated through March 31, 1996 and in accordance with the delinquent tax rate determined by the Internal Revenue Service. 26 U.S.C. § 6621(a)(2); *SEC v. First Jersey Securities, Inc.*, 890 F.Supp. 1185, 1212 (S.D.N.Y.1995) (utilizing the IRS rate for interest on amounts disgorged); *Lorin*, 877 F.Supp. at 201 (same); *Drexel Burnham Lambert*, 837 F.Supp. at 612 n. 8 (same).

## C.

The SEC additionally asks the court to impose civil penalties pursuant to the Securities Enforcement Remedies and Penny Stock Reform Act of 1990 ("Penalty Act"). *See* The Exchange Act, § 21(d)(3) and The Adviser Act § 209(e) [13]. Specifically, the SEC argues that each of the violations of the defendants should fall under the Second Tier of Civil Penalties. For Moran Sr.'s four violations of securities statutes and two Rules thereunder, the SEC seeks the imposition of an aggregate penalty amounting to $25,000 for each statutory violation, thereby requesting a total penalty of $100,000 upon Moran Sr. personally. The SEC recommends a to-

13. The language for each section is identical and provides:

(1) Whenever it shall appear to the Commission that any person has violated any provision of this title, [or] rules or regulations thereunder … the Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to impose, upon proper showing, a civil penalty to be paid by the person who committed such violation.

(2) Amount of Penalty—

(A) First Tier—The amount of penalty shall be determined by the court in light of the facts and circumstances. For each violation, the amount of the penalty shall not exceed the greater of (I) $5,000 for a natural person or $50,000 for any other person, or (ii) the gross amount of pecuni-

ary gain to such defendant as a result of the violation.

(B) Second Tier—Notwithstanding subparagraph (A), the amount of penalty for each such violation shall not exceed the greater of (I) $50,-000 for a natural person or $250,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if the violation described in paragraph (1) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.

The statutes provide for a Third Tier of penalties, however, since it is not alleged that any of defendant's violations fall within the Third Tier, it is not relevant to this case.

tal civil penalty of $50,000 to be imposed upon Moran Asset for its violation of two sections of the Advisers Act and one Rule thereunder. Lastly, the SEC seeks a penalty in the amount of $25,000 against Moran Brokerage for violating one section of the Exchange Act and one Rule thereunder. Thus, the total amount of penalties sought from the defendants constitutes $175,000. Defendants argue that because of the extreme hardship Moran Sr. and his companies have endured since this investigation commences, the court should not award civil penalties. After reviewing all of the evidence the court finds that civil penalties are warranted in this matter.

■ By enacting the Penalty Act, Congress sought to achieve the dual goals of punishment of the individual violator and deterrence of future violations. Indeed, the House Report on the Penalty Act made clear its intention, stating:

> The Committee believes that the money penalties proposed in this legislation are needed to provide financial disincentives to securities law violations other than insider trading.... Absent a criminal prosecution or a private suit for damages ... even the defendant who makes a deliberate decision to violate the law and causes significant harm to the markets does not risk any monetary sanction more severe than an order of disgorgement. Disgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud. A violator who avoids detection is able to keep the profits resulting from illicit activities. Currently, even a violator who is caught is required merely to give back his gains with interest, leaving him no worse off financially than if he had not violated the law. The Committee therefore concluded that authority to seek or

impose substantial money penalties, in addition to the disgorgement of profits, is necessary for the deterrence of securities law violations that otherwise may provide great financial returns to the violator.

H.R.Rep. No. 101–616, 101st Cong., 2d Sess., *reprinted in* 1990 U.S.Code Cong. & Admin.News 1379, 1384–86. Both the Exchange Act and the Advisers Act provide that any civil penalty is to be determined by the Court "in light of the facts and circumstances" of the particular case. 15 U.S.C. § 78u(d)(3) and § 80(b)–9(e) (Exchange Act) and (Advisers Act). Here, the actions of Moran Sr. blaming others, including the SEC for his own conduct, his downplaying of the violations for which he is liable, the loss of money by Moran Sr.'s clients, and the intentional nature of most of Moran Sr.'s violations, warrant the imposition of civil penalties.

While recognizing that the SEC seeks significantly less than potential maximum aggregate penalty of $1,800,000 [14], the court feels that the SEC's request is nonetheless too severe under the circumstances of this case. In making this determination the court considers the personal suffering which Moran Sr. has experienced, the substantial loss of business incurred by Moran Sr.'s firms, the other measures imposed by the court, and the nature of Moran Sr.'s violations. Taking into account all of the facts and circumstances in this case, the court imposes civil penalties in the amount of $25,000 for Moran Sr.'s aggregate violations, $50,000 for the conduct of Moran Asset, and $25,000 for the violations of Moran Brokerage. The amount of civil penalties then, totals $100,000.

Both sides have offered substantial authority in the form of prior cases, to support their views of the appropriate civil penalty herein. Considering the discretionary nature of the civil penalty framework, prior decisions and

---

14. Moran Sr. was found liable for four separate statutory violations and two Rule violations. Under the Second Tier penalties Moran Sr. could have been liable for $50,000 per violation, which would total $300,000. Moran Asset was found liable for three separate statutory violations and one Rule violation. The maximum second tier violations for a person other than a natural person is $250,000 per violation, which would total $1,000,000 for the four violations. Moran Brokerage was found to violate one statutory section and one Rule, which would total a maximum of $500,000. The total maximum penalty, which could be imposed upon the defendants, is therefore $1,800,000.

consent decrees are of little comparative value for any individual matter. Each case, of course, has its own particular facts and circumstances which determine the appropriate penalty to be imposed. The court, however, recognizes the usefulness of utilizing these cases to put the current matter in a clearer perspective. Careful review of these other matters demonstrate that the penalties to be invoked in this case are commensurate or even more lenient than those previously imposed. *See e.g., In the Matter of Account Management Corp.*, 1995 WL 579449, 1995 SEC LEXIS 2554 (September 24, 1995) ($100,000 civil penalty appropriate because defendant favored certain clients over others) [15]; *In the Matter of Kenneth Von Kohorn et al.*, 1995 WL 71287, 1995 SEC LEXIS 354 (February 22, 1995) (failure to fully disclose management fees and timely file Form ADVs warranted imposition of $250,000 civil penalty); *SEC v. Strategic Management Inc.*, SEC Litigation Release, No. 13,710, 1993 WL 268506 (N.D.Tex. July 9, 1993) (total penalty of $200,000 assessed on defendants for failing to disclose their potential profit for assigning their advisory contract).

In those cases cited where lesser penalties were assessed, there were circumstances, not present in this matter, which warranted such an extreme degree of leniency. *See SEC v. Patel*, 1994 WL 364089 1994 U.S.Dist. LEXIS 9479 (S.D.N.Y. July 13, 1994), *aff'd in part, rev'd in part, remanded*, 61 F.3d 137 (2d Cir.1995); *In the Matter of Hazel B. Canham*, Investment Advisers Act Release No. 1386 (September 30, 1993). In *Patel*, no civil penalties were assessed when the defendant had already paid a criminal fine, disgorged illegal profits, and transferred substantial assets to settle a private securities action. Here, only disgorgement has been imposed upon Moran Sr., thus his circumstances are inapposite to the situation in *Patel*. Similarly, in *Canham*, while the defendant was ordered to pay a $5000 civil penalty for her Adviser Act liability, her business was only worth $20,000. Considering that Moran Sr.'s businesses still maintain a combined worth of some five million dollars, the penalty in *Canham* was far more severe.

As previously discussed, the court finds that contrary to Moran Sr.'s protestations, his violation of Section 206(2) of the Advisers Act constituted a fraud upon his clients. Notwithstanding such a finding, Moran acted with negligence and apparently had no intent to violate the law. Accordingly, the court finds that the violations of Section 206(2) by Moran Sr. and Moran Asset constitute a First Tier violation, rather than a Second Tier violation, as urged by the SEC. While the language of the statute describing the Second Tier penalty includes fraudulent conduct, there is an unmistakable difference between conduct which negligently operates as a fraud when compared to conduct engaged in with the intent to defraud clients. It is illogical to view negligent actions in the same light as intentional wrongdoing.

Although not rising to the level of a Second Tier violation, the seriousness of the conduct of Moran Sr. and Moran Asset cannot be understated. Investment advisers are entrusted with the responsibility and duty to act in the best interest of their clients. Here, the defendants obviously breached their duty. Moreover, Moran Sr. did not transfer the money from his personal accounts to rectify the shortage to his clients' accounts. His failure to recognize the harm that his negligence caused, coupled with apparent lack of understanding of the significance of his actions, warrant the imposition of the maximum penalty permitted under the First Tier for Moran Sr. Due to the extreme loss of business suffered by Moran Asset, the court will not impose upon it the maximum penalty of $50,000. Accordingly, the court imposes civil penalties in the amount of $5,000 and $25,000 upon Moran Sr. and Moran Brokerage for their respective violations of Section 206(2) of the Advisers Act.

Considering the willful and intentional conduct engaged in by the defendants

---

**15.** Moran Sr.'s conduct is more egregious than the actions in *Account Management* because he favored himself over his clients.

regarding the filings of the Forms ADV and BD, the court agrees that these transgressions rise to the level of Second Tier violations. As the court has previously found, the information regarding directors is material. *Moran I*, 922 F.Supp. at 899. The failure to provide accurate information regarding the directors of the company precluded any potential client from accurately learning "who has corporate control and influence on the management of the firm, whether there is director independence, and whether the directors bring any potential conflict of interest to the firm." *Id.* Together with the fact that the violations continued over a period of years, Moran Sr.'s seeming refusal to acknowledge the gravity of his actions, and his repeated attempts to push the blame on to others, the court believes that civil penalties are particularly appropriate.

Under the circumstances of this case, although the failure to accurately disclose the directors of his firms violates three statutory provisions and two rules, Moran Sr.'s actions constitute only two transgressions: the misrepresentation of the directorships of Moran Asset and the same misrepresentation affecting Moran Brokerage. Nevertheless, the court is mindful of the financial losses and pain personally suffered by Moran Sr. The court, therefore, will impose upon Moran Sr. a penalty in the amount of $10,000 for his violations relating to the Forms ADV, and a penalty in the amount of $10,000 for his violations relating to the Forms BD.

The court has found Moran Asset and Moran Brokerage liable for misrepresenting the directorships of each firm, in deliberate disregard of the regulatory requirements. As previously explained, although the conduct at issue involves four statutory and two Rule violations, the conduct actually involves simply two acts. Specifically, the misrepresentation of the directorships of Moran Asset and the same misrepresentations respecting Moran Brokerage. Consequently, the court will assess civil penalties in the amount of $25,000 each against Moran Asset and Moran Brokerage. The court believes that this amount of penalty, while taking into account the specific circumstances of Moran Sr and his firms, is necessary for the protection of investors, the market, and to deter future violations by Moran Sr. and his firms.

## CONCLUSION

Having previously determined the liability of the defendants in this matter, the court hereby incorporates the previous findings contain in its opinion of April 2, 1996 and orders that:

(1) Frederick A. Moran and Moran Asset Management Inc. be permanently **enjoined** from violating Section 206(2) of the Advisers Act [15 U.S.C. § 80b–6(2) ]; Section 204 of the Advisers Act and Rule 204–1(b)(1) thereunder [15 U.S.C. § 80b–4; 17 C.F.R. § 275.204–1(b)(1) ]; and Section 207 of the Advisers Act [15 U.S.C. § 80b–7];

(2) Frederick A. Moran and Moran & Associates, Inc., Securities Brokerage be permanently **enjoined** from violating Section 15(b) of the Exchange Act and Rule 15b3–1 thereunder [15 U.S.C. § 78o(b); 17 C.F.R. § 240.15b3–1];

(3) Frederick A. Moran **disgorge** $9551.17 plus prejudgment interest calculated to March 31, 1996 to the United States Treasury;

(4) Frederick A. Moran pay a civil money penalty in the amount of $25,000 dollars to the United States Treasury;

(5) Moran Asset Management Inc. pay a civil money penalty in the amount of $50,000 to the United States Treasury; and

(6) Moran & Associates, Inc. Securities Brokerage pay a civil money penalty in the amount of $25,000 to the United States Treasury

The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**