**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Robert D. POIRIER, Robert J. Palm, James R. Vincent and Richard E. Wensel, Defendants.**

**No. CIV 96–2243–PHX–EHC.**

United States District Court, D. Arizona.

March 29, 2001.

---

David K. Duncan, U.S. Attorney's Office, Phoenix, AZ, Kevin P. O'Rourke, S.E.C., Washington, DC, for plaintiff.

Michael Lee Parrish, Morrison & Heckler LLP, Phoenix, AZ, for Robert D. Poirier, Robert J. Palm, defendants.

James R. Vincent, Douglas, Isle of Man, pro se.

Richard E. Wensel, Scottsdale, AZ, pro se.

## ORDER

CARROLL, District Judge.

Pending before the Court is Plaintiff's Motion for Summary Judgment [Dkt. 212]. The motion is fully briefed and ready for the Court's determination.

## I. Background

Plaintiff alleges that Defendants have participated in a classic "pump and dump" scheme by forming Garcis U.S.A., Inc., ("Garcis"), acquiring shares of Garcis and then pumping false information into the market about Garcis to inflate share prices intending to sell off their shares at the inflated value before the false information was discovered.

**Formation of Garcis:** In the summer of 1994, Robert Crain, Robert Poirier and Robert Palm began discussing the possibility of forming Garcis. [Dkt. 214, Ex. 19, Crain Dep. at 102–106]. Crain had experience in athletic shoe retail and knew Jose Antonio Garcia, one of the principals of a company called Garcis/Mexico. [Dkt. 214, Ex. 19, Crain Dep. at 142–144]. Poirier and Palm ran a company called Select Financial Corporation ("Select") that put together "deals" and raised money for other companies. [Dkt. 214, Ex. 19, Crain Dep. at 91–92]. Poirier was the vice-president, secretary and director of Select while Palm was the president and a director of Select. [Dkt. 147, Ex. E, Poirier Response # 10 'at 29; Dkt. 147, Ex. F, Palm Response # 10 at 29]. James Vincent, Poirier's and Palm's offshore nominee shareholder, operated his private company, Selection Resources, from his home in Isle of Man. [Dkt. 153, Ex. A, Vincent Dep. at 6, 127–128]. Although Selection Resources was Vincent's private company, it was beneficially owned by Poirier and Palm. [Dkt. 153, Ex. A, Vincent Dep. at 6, 127–128].

Poirier, Palm and Crain agreed that Crain would contact Garcia at Garcis/Mexico and Poirier and Palm, through Select, would establish and fund Garcis. [Dkt. 214, Ex. 19, Crain Dep. at 102–106, 164–168]. The plan was that after Garcis was founded, it would enter into a distribution agreement with Garcis/Mexico that would allow Garcis to distribute athletic products in the United States that had been manufactured by Garcis/Mexico. [Dkt. 214, Ex.

19, Crain Dep. at 141–144]. Crain, Poirier and Palm also agreed that Garcis should be transformed from a private company into a public company so that money could be raised through the private placement of stock. [Dkt. 214, Ex. 19, Crain Dep. at 69–72]. To accomplish this, Garcis would be merged with a pre-existing shell corporation.[1] [Dkt. 214, Ex. 19, Crain Dep. at 69–72].

In August 1994, Crain, Poirier and Palm traveled to Mexico to meet with Garcia and on August 24, before leaving Mexico, Crain executed a distribution agreement with Garcis/Mexico as planned. [Dkt. 214, Ex. 19, Crain Dep. at 145, 170]. On September 7, 1994, Crain, Poirier and Palm (and others) formed Garcis as a private Wyoming corporation for the purposes of performing the distribution agreement with Garcis/Mexico. [Dkt. 214, Ex. 19, Crain Dep. at 288]. On that same day, Garcis entered into a Plan of Merger with Euroblock, a dormant shell corporation owned by Palm and Poirier. [Dkt. 214, Ex. 19, Crain Dep. at 303]. Poirier and Palm asked Philip Jorgenson, a friend, and Robert Metivier, an employee of Select, to be their designees on the Euroblock Board of Directors to approve the Euroblock/Garcis merger. [Dkt. 214, Ex. 20, Jorgenson Dep. at 70–74; Dkt. 214, Ex. 21, Metivier Dep. at 83–85]. The Euroblock/Garcis merger became effective on October 27, 1994, at which time Euroblock changed its name to Garcis. [Dkt. 214, Ex. 50]. Poirier and Palm, through Select, paid the legal fees associated with the formation of Garcis and the merger of Garcis with Euroblock. [Dkt. 214, Ex. 15, Poirier Admin. Dep. at 47].

Following the Euroblock/Garcis merger, Garcis had difficulty listing, and therefore trading, its stock on an exchange. [Dkt. 214, Ex. 19, Crain Dep. at 341–343]. To resolve this problem Crain, Poirier and Palm agreed to have another company called Questex acquire Garcis in a reverse acquisition. [Dkt. 214, Ex. 19, Crain Dep. at 347–60]. Questex was a dormant public company that was owned by Palm and controlled by both Palm and Poirier. [Dkt. 213, Ex. A, Wensel Dec. at 3–5; Dkt. 214, Ex. 19, Crain Dep. at 349–50]. Palm and Poirier seated their designees, Richard Wensel, Phillip Jorgenson and Robert Metivier on the Questex board to authorize the acquisition of Garcis. [Dkt. 214, Ex. 19, Crain Dep. at 363; Dkt. 213, Ex. A, Wensel Dec. at 5; Dkt. 214, Ex. 20, Jorgenson Dep. at 49–50]. On December 15, 1994, in a reverse acquisition, Questex acquired Garcis's outstanding stock, with the remaining company being Garcis. [Dkt. 214, Ex. 53].

After the acquisition, Crain remained the president of Garcis and joined Wensel, Jorgenson and Metivier on the Garcis board. [Dkt. 214, Ex. 61 at 6480]. As a result of the acquisition, Garcis had 11,290,003 shares of stock issued and outstanding that were traded on the National Association of Securities Dealers Bulletin Board. [Dkt. 214, Ex. 54].

**Stock transfers and sales:** Shortly after the Garcis/Euroblock merger agreement was signed on September 13, 1994, Poirier and Palm arranged for and paid the legal fees associated with eight stock subscription agreements to be sent to Vincent.[2] [Dkt. 214, Ex. 15, Poirier Admin.

---

1. A public shell company is one that is already registered for public trading but is not currently trading shares.

2. Defendants object to exhibits 51 and 92, arguing that exhibit 51 is not properly authenticated under Rule 56 and that neither exhibit supports the statement that Poirier and Palm arranged for the subscriptions. Neither argument is persuasive given Poirier's administrative testimony which says that he directed his attorney Gregory Wilson to arrange the pri-

Dep. at 59–60; Dkt. 214, Exhibits 51, 52, 55 & 92]. The stock subscription agreements authorized Vincent to purchase 3 million free trading shares of Euroblock stock for $30,000 for un-named offshore clients.[3] [Dkt. 214, Ex. 15, Poirier Admin. Dep. at 59–60; Dkt. 214, Exhibits 51, 52, 55 & 92].

After the Euroblock/Garcis merger on November 28, 1994, Garcis' stock transfer agent, OTC Stock Transfer ("OTC"), issued 500,000 Garcis shares to Palm and issued 3 million trading shares to Vincent. [Dkt. 214, Ex. 83]. The shares issued to Vincent were distributed pursuant to Rule 504 of Regulation D, which exempts certain limited securities from registration. [Dkt. 214, Exhibits 51 & 92].

Meanwhile, in late December 1994, 367,-500 shares of Questex stock were issued to Vincent in the name of English Association of American Bond and Shareholders and delivered to Selection Resources' account at ADM Securities ("ADM"). [Dkt. 214, Ex. 82]. These shares were unregistered pursuant to Regulation S of the '33 Act. [Dkt. 214, Ex. 87]. Before Questex acquired Garcis in the reverse acquisition, Poirier sold 148,650 Questex shares out of the Selection Resources account at ADM for proceeds of $123,136. [Dkt. 214, Ex. 79].[4] As a result of the Questex/Garcis acquisition, on January 5, 1995, the unsold Questex shares in the Selection Resources account were exchanged for Garcis shares. [Dkt. 214, Ex. 79]. Poirier directed that 17,021 of the post-acquisition Garcis shares

be sold resulting in $81,365 in proceeds. [Dkt. 214, Ex. 79].

When the vote on the reverse acquisition by Questex was taken, Palm voted his 500,000 shares in favor of the acquisition and Vincent voted his 3 million shares that he held in favor of the acquisition. [Dkt. 214, Ex. 60].[5] After the reverse acquisition was approved on December 15, 1994, Palm exchanged his 500,000 pre-acquisition shares for 500,000 post acquisition shares and Vincent exchanged his 3 million pre-acquisition shares for 2,975,000 post-acquisition shares. [Dkt. 214, Exhibits 82, 84, 85, & 88]. Vincent's 2,975,000, shares were issued to him in the name of the English Association of American Bond and Shareholders, Ltd. [Dkt. 214, Exhibits 84, 85, & 88]. All of the 3,495,000 post-acquisition shares were unregistered and issued pursuant to Rule 504 of Regulation D. [Dkt. 214, Exhibits 51 & 92].

In early January 1995, Vincent loaned 1,250,000 of his unregistered shares to Poirier so that Poirier could sell them into the market at his discretion to raise capital for Garcis and for personal funds. [Dkt. 153, Ex. A, Vincent Dep. 175–186; Dkt. 214, Ex. 44]. The 1,250,000 shares were identified in 8 "share loan agreements." [Dkt. 214, Ex. 44].

In addition to the shares that were loaned from Vincent, Poirier and Palm had Garcis issue them additional shares. For example, at the annual shareholders' meeting in July 1995, Poirier and Palm directed

---

vate placement. Accordingly, the Court will not strike these exhibits.

**3.** Vincent had refused to provide the names of any of the offshore clients or proof of payment of the $30,000 for the Euroblock stock.

**4.** Defendants object to exhibit 79, arguing that it has not been properly authenticated under Rule 56, however, the document is printed on ADM letterhead and in accordance

with Rules of Evidence 901 and 902, the Court will not strike this exhibit.

**5.** Defendants object to exhibit 60, arguing that it has not been properly authenticated under Rule 56, however, in conjunction with the circumstances this exhibit is sufficiently distinctive to satisfy Rule of Evidence 901(4), and for that reason the Court will not strike this exhibit.

Garcis to issue them 2.4 million shares of Garcis stock in exchange for the "loans" they had made to Garcis. [Dkt. 213, Ex. A, Wensel Decl. at ¶ 15]. Poirier and Palm distributed both the shares that were on loan from Vincent and the additional shares that they had instructed Garcis to issue to them throughout various accounts and brokerage houses across the United States and Canada.[6] Between January and September of 1995, Poirier, Palm and Vincent sold approximately 1,195,000 shares for proceeds of $1,903,316. The majority of these proceeds were deposited in bank accounts maintained by Poirier and Palm in Scottsdale.

**Operation of Garcis:** Poirier and Palm, through Select, funded the day-to-day to operations of Garcis. [Dkt. 214, Ex. 19, Crain Dep. at 197–200, 252–57, 438; Dkt. 214, Ex. 22, Rahm Dep. at 74, 154; Dkt. 213, Ex. A, Wensel Decl. at ¶ 8]. Palm converted checks written to Garcis into Select's account and wrote and signed checks from the Garcis checking account. [Dkt. 214, Ex.17, Palm Admin. Dep. at 210–211]. Poirier and Palm appointed Garcis' board of directors and officers and paid their salaries. [Dkt. 214, Ex.19, Crain Dep. at 325–328, 1092–1102; Dkt. 214, Ex. 20, Jorgenson Dep. at 47–51, 70–79, 89–92; Dkt. 214, Ex. 22, Rahm Dep. at 93–94]. After Crain was terminated, Poirier and Palm financed Crain's $25,000 settlement agreement. [Dkt. 214, Ex. 32, Halligan Dep. at 61–63]. They agreed to finance the million dollars due under Garcis's sponsorship agreement with Continental Indoor Soccer League and, in January 1995, they paid $120,000 pursuant to the agreement. [Dkt. 214, Ex. 19, Crain Dep. at 452–457, 463–464, 469–497, 502–506]. Garcis's offices was operated out of Select's offices in Scottsdale and Garcis' annual shareholder's meeting was held there in 1995. [Dkt. 213, Ex. A, Wensel

Decl. at ¶ 8]. Through Select, Poirier and Palm were the exclusive sales agents for Garcis and Poirier and Palm also were responsible for providing financial public relations services to Garcis with the goal of promoting Garcis and Garcis securities to the brokerage community and the general public. [Dkt. 214, Ex. 56; Dkt. 214, Ex. 19, Crain Dep. at 403–408].

In promoting Garcis, Poirier and Palm caused false and misleading press releases to be issued. For example, Palm and Poirier were responsible for the January 19, 1994 press release which announced Garcis's sponsorship of the Continental Indoor Soccer League (CISL). [Dkt. 214, Exhibits 58 & 62; Dkt. 214, Ex. 21, Metivier Dep. at 179–183; Dkt. 214, Ex. 19, Crain Dep. at 510]. This press release was misleading because it failed to mention that the sponsorship agreement with CISL required Garcis to make significant financial contributions to the league in exchange for sponsorship rights that Garcis would be unable to make because it had no funds. [Dkt. 213, Wensel Decl. at ¶ 19(a); Dkt. 214, Ex. 19, Crain Dep. at 446–474]. Similarly, Poirier and Palm were responsible for dissemination of the March 7, 1995 press release which stated that Garcis had $1.3 million dollar sales backlog and would be sending the first shipment to Southwest Airlines. [Dkt. 214, Ex. 65; Dkt. 214, Ex. 21, Metivier Dep. at 206–207; Dkt. 213, Ex. A, Wensel Decl. at ¶ 19(b) ]. This press release was false and misleading because Garcis did not have a $1.3 million dollar backlog of sales and had no contract with Southwest Airlines. [Dkt. 213, Ex. A, Wensel Decl. at ¶ 19(b); Dkt. 214, Ex..21, Metivier Dep. at 210–214; Dkt. 214, Ex. 27, Stone Dep. at 12–34]. Poirier and Palm, also caused Ray Barner, who was hired to publicize Garcis, to have misleading stories published about Garcis and to

6. The account and brokerage information is detailed in Section V of this Order.

have investor packages distributed that re-published the misleading stories. Based on information from Poirier and Palm, Barner had SGA Goldstar, Sheft Ticks, Hot Stocks and MoneyWorld publish untrue information suggesting that Garcis had entered into contracts with Southwest Airlines, the Scottsdale Hilton, the Las Vegas Hilton and the Phoenician Hotel.[7]

Poirier and Palm also prepared and maintained Garcis's books and records and arranged to have them audited. [Dkt. 214, Ex. 19, Crain Dep. at 615–622; Dkt. 214, Ex. 17, Palm Admin. Dep. at 135–138, 184–186; Dkt. 213, Ex. A, Wensel Decl. at ¶ 8]. They also prepared, reviewed, and caused to be filed Garcis' public reports with the Securities and Exchange Commission, including a Form 8–K filed on December 20, 1994 (after the reverse acquisition by Questex) and the annual report submitted as form 10–K on June 15, 1995. [Dkt. 214, Ex. 21, Metivier Dep. at 164–171, 227–236; Dkt. 214, Exhibits 61 & 65].

Based on these facts, Plaintiff seeks Summary Judgment on the four counts of its Complaint: (1) Violation of the Antifraud provisions of the 1933 Securities Act (" '33 Act") and the 1934 Exchange Act (" '34 Act"); (2) Violation of the Registration Provisions of Section 5, (3) Violation of the Credit Extension Provisions of Section 7(f); and (4) Violations of the beneficial ownership provisions for Garcis Stock. Plaintiff also seeks injunctive relief, disgorgement of "ill-gotten gains," pre-judgment interest, and civil penalties.

## II. Standard for Summary Judgment

A motion for summary judgment may be granted if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). To defeat the motion, the non-moving party must show that there are genuine factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court views the evidence in the light most favorable to the non-moving party and draws any reasonable inferences in the non-moving party's favor. *Berry v. Valence Technology, Inc.*, 175 F.3d 699, 703 (9th Cir.1999), *cert. denied*, 528 U.S. 1019, 120 S.Ct. 528, 145 L.Ed.2d 409 (1999).

## III. Discussion

■ Defendants, in their Response to Plaintiff's Motion for Summary Judgment, raise several objections to Plaintiff's evidence offered in support of its Motion.[8] Defendants first argue that the Declaration of Richard Wensel can not be considered by the Court because the automatic sanction of Rule 37(c)(1) prevents Plaintiff from utilizing any evidence that was not disclosed in accordance with Rule 26. This argument is unpersuasive. First, Plaintiff identified Richard Wensel as an individual likely to have discoverable information in its initial disclosures, [Reply at App. C, Dkt. 228], and went on to identify the subjects that Wensel would have information about in accordance with Rule 26 in its interrogatory responses, [Reply at App. D & E, Dkt. 228]. Second, Defendants apparently argue that Plaintiff was required to not only disclose Wensel's identity as a possible witness and identify the topics about which he might provide information,

---

7. Because the Depositions of Crain, Melcher and Barner fully describe the details of each press release and why each was misleading, the complete details are not recounted in this Order.

8. These objections were also raised in Defendants' Motion to Strike which was denied by Magistrate Judge Verkamp on September 26, 2000. [Dkt. 248].

but that Plaintiff's were also required to produce a copy of the Declaration after it was taken if Plaintiff intended to use it as evidence. Defendants cite no authority that would require Plaintiff to provide a copy of the Wensel declaration other than to include it with their motion for Summary Judgment. Finally, Defendants argue that the Wensel Declaration should be excluded because it is materially inconsistent with Wensel's prior administrative testimony. To support this claim Defendants redact portions of Wensel's administrative testimony and excerpt Wensel's explanations and elaborations. A complete reading of Wensel's administrative testimony reveals that Wensel's administrative testimony is not materially inconsistent with his declaration submitted in support of Plaintiff's Motion. Accordingly, the Wensel declaration will not be excluded under Rule 37(c)(1).

■■■ Defendants also seek to exclude portions of Plaintiff's Statement of Facts because the "facts" are based upon inappropriate inferences, conclusions and argument and also because they are not supported by the record. For example, Plaintiff in several paragraphs states that "Poirier and Palm directed Garcis" by performing some action such as appointing their nominees to sit on Garcis's board of directors. The purpose of the Statement of Facts is to provide the Court with an index for the documentation that supports the party's brief. Therefore, to the extent that Plaintiff has utilized conclusions or inferences within its Statement of Facts, the Court will not consider the conclusions or inferences but will only use the statements in locating the supporting documentation. To the extent that the Court finds that any of the statements are not supported by the underlying documentation, the Court will address those statements when the documentation is considered.

Finally, Defendants object to several documents because they are either based on hearsay or not authenticated in accordance with Rule 56(e). Should the Court rely upon any of the documents objected to by Plaintiff on these grounds, the Court will address the objections at that time.

*Count I—Violations of the Anti-fraud Provisions of the '33 and '34 Act:*

■■■ Sections 17(a) of the Securities Act of 1933 ("the '33 Act") and Rule 10b–5 of the Securities Exchange Act of 1934 ("the '34 Act") are analogous anti-fraud provisions that prohibit fraudulent conduct in connection with the offer and sale of securities. 15 U.S.C. § 77q; § 78j(b); 17 C.F.R. § 240.10b–5; *see In re Washington Public Power Supply System Securities Litigation,* 823 F.2d 1349 (9th Cir.1987). To prove violations of these provisions Plaintiff must show that Defendants: (1) made untrue statements or omissions; (2) of a material fact; (3) with scienter; (4) in connection with the offer, purchase, or sale of securities. *See Basic Inc. v. Levinson,* 485 U.S. 224, 230, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)(summarizing relevant case law explaining the elements of fraud claims under 10b–5). In order to meet the scienter requirement, plaintiff must show either knowing or reckless conduct on the part of defendants. *See Hanon v. Dataproducts Corp.,* 976 F.2d 497, 507 (9th Cir.1992); *see also Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 214, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (holding that negligent conduct is not actionable under Rule 10b–5). Conduct is reckless if it is highly unreasonable, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known or is so obvious that the actor must have been aware of it. *See Hollinger v. Titan Capital Corp.,* 914 F.2d

1564, 1569 (9th Cir.1990), (en banc), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991).

Through substantial evidence, Plaintiff has proven that Poirier and Palm operated Garcis through a undisclosed control group. First, Palm and Poirier were instrumental in forming Garcis and in every subsequent corporate machination that ensued to take Garcis public: after forming Garcis, Poirier and Palm merged Garcis with Euroblock and, when Garcis was still having trouble listing its stock, Poirier and Palm arranged for Garcis to acquire Questex and retain the Garcis name. Second, Poirier and Palm appointed Garcis's board of directors who acted as their nominees. Third, Poirier and Palm funded the day to day operations of Garcis and prepared and controlled Garcis's records and reports. Fourth, Poirier and Palm orchestrated the dissemination of false press releases and other publications describing non-existent backlogs of orders and contracts for the sale of athletic shoes. Fifth, Poirier and Palm failed to disclose their controlling ownership of Garcis stock. Additionally, Poirier and Palm failed to acknowledge their control of Garcis in submitting Garcis' 8–K form to Plaintiff after the Questex acquisition and also failed to disclose their control of Garcis in Garcis' annual reports (Form 10–k).

By failing to disclose their control of Garcis, Poirier and Palm made a material omission in connection with the offer of securities; reasonable investors would find the existence of a control group important when deciding whether to purchase Garcis stock. *See Nelson v. Serwold,* 576 F.2d 1332 (9th Cir.1978)(holding that the failure to disclose the existence of a control group that is the driving force behind a public company is a material omission that violates the anti-fraud provisions). While materiality is often a question of fact precluding summary judgment, here reasonable minds could not differ; Poirier and Palms omissions were material. *See Fecht v. Price,* 70 F.3d 1078, 1080 (9th Cir.1995)(quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Furthermore by repeatedly causing patently false press releases to be published that misstated Garcis's sales and revenue prospects, Poirier and Palm made material misrepresentations.

Plaintiff has also offered sufficient evidence about which reasonable minds could not differ on Defendants' scienter. The evidence as presented leads to only one possible conclusion: Poirier and Palm intentionally concealed their control over Garcis and caused press releases to issue that misstated revenue and sales and falsely claimed business contracts that were not in place. *See In re Worlds of Wonder Securities Litigation,* 35 F.3d 1407, 1412 (9th Cir.1994)(recognizing that although materiality and scienter are both fact-specific issues which should ordinarily be left to the trier of fact, summary judgment may be granted in certain securities fraud cases). Poirier and Palm knew that they controlled every aspect of Garcis and still failed to indicate that control. Poirier and Palm also knew that Garcis did not have contracts with Southwest Airlines, the Scottsdale Hilton or the Phoenician Hotel and yet they stated on press releases that these contracts existed. Finally, Plaintiff has demonstrated that the material omissions and misrepresentations were made in connection with the offer and sale of securities because Palm and Poirier sold at least 1,195,234 shares of Garcis stock for proceeds of $1,903,316.

Accordingly, the Court finds that Defendant has failed to raise a triable issue of material fact with respect to Plaintiff's anti-fraud claims. For this reason the

Court will grant Plaintiff's Summary Judgment motion on this Count.

*Count II—Violations of Section 5:*

 Section 5(c) of the '33 Act prohibits any offer or sale of any unregistered security in interstate commerce unless either the security or the transaction falls within one of the exemptions to the Act. 15 U.S.C. § 77e. Section 3 lists the types of securities that are exempt from registration and § 4 lists the types of transactions that do not require the security to be registered. 15 U.S.C. § 77d. Exemptions from registration provisions of the Securities Act are to be narrowly construed in order to further the purpose of the Act; to provide full and fair disclosure of character of the securities and to prevent fraud in the sale thereof. *See SEC v. Murphy,* 626 F.2d 633, 641 (9th Cir.1980). Although the burden shifts to the Defendants to show that an exemption applies once Plaintiff has established the prima facie elements of a § 5 violation, on a motion for summary Judgment, the moving party carries the burden of showing that no genuine issue of material fact exists, even though at trial the opponent would have the burden of proving that one of the exceptions applies. *Id.*

Here, Poirier and Palm traded both Questex and Garcis stock that was unregistered. Neither type of stock falls within the exceptions to § 5(c) set out in § 3. Therefore, the only remaining question is whether the transactions fall within any of the exceptions listed in § 4. Section 4(1) provides an exception for offerings made by persons other than issuers, underwriters and dealers and § 4(2) provides an exception for private placements and other non-public offerings. 15 U.S.C. § 77d.

Plaintiff has provided evidence that demonstrates that § 4(1) can not apply because Poirier and Palm were statutory underwriters. Statutory underwriters are individuals who purchase securities from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security. See 15 U.S.C. § 77b(a)(11), § 2(a)(11). Because Poirier and Palm controlled both Questex and Garcis and obtained their stock with the intent to redistribute it,[9] they do not meet the § 4(1) exception. *See Pennaluna & Co., Inc. v. SEC,* 410 F.2d 861, 865 (9th Cir.1969).

 Plaintiff has also provided evidence that § 4(2) can not apply to either the Questex transactions or the Garcis transactions because both transactions were secondary distributions. Secondary distributions occur when controlling shareholders sell the issuer's unregistered securities for the purpose of raising money for the company or themselves. *SEC v. International Chem. Development Corp.,* 469 F.2d 20, 27–28 (10th Cir.1972). Because Defendants have failed to raise any material issues of fact with regard to their control over Questex and Garcis and their failure to register the securities before selling them, and their intention to sell the securities rather than hold them for investment, reasonable minds could not find that any of the exceptions to § 5 apply.

Therefore, the Court finds that Defendants have failed to raise a triable issue of material fact with respect to Plaintiff's claim that Defendants violated § 5 and for this reason the Court will grant Plaintiff's Summary Judgment motion on this Count.

*Count III—Violation of Section 7(f):*

 Section 7(f) the '34 Act governs the "use of credit for the purchase or carrying of securities." *SEC v. Drexel Burnham Lambert Inc.,* 837 F.Supp. 587, 610 (S.D.N.Y.1993); *aff'd, SEC v. Posner,*

---

9. Bob Poirier stated that he thought the Garcis deal was good because he would be able to make a lot of money "off of the stock." [Dkt. 214, Ex. 19, Crain Dep. at 183].

16 F.3d 520, (2nd Cir.1994); *cert. denied,* 513 U.S. 1077, 115 S.Ct. 724, 130 L.Ed.2d 629 (1995). Section 7(f) is implemented through Regulations T and X. Regulation T imposes initial margin requirements and payment rules on securities transactions and prevents brokers from extending excessive credit to investors to finance purchases or sales in margin accounts in violation of those requirements and rules. Regulation X, which pertains to investors, forbids investors from deliberately causing brokers to extend credit to purchase securities in violation of Regulation T.

Poirier, Palm and Vincent violated Regulation X by causing the broker handling the Selection Resources account at Dean Witter in Orlando, Florida to violate Regulation T. In March 1995, Poirier directed the broker handling the account to purchase 64,500 shares of Garcis stock requiring Dean Witter to extend him the $256,872 necessary to purchase the stock. At the time Poirier directed the purchase of the shares, Selection Resources did not have the funds to pay for the purchases. Furthermore, despite repeated demands, ·Poirier, Palm and Vincent have failed to pay for the stock purchases.

To establish a violation of Regulation X, and thereby § 7, Plaintiff must show not only that Defendants caused Dean Witter to extend them credit, but must also show that Defendants deliberately caused Dean Witter to violate Regulation T. Only circumstantial evidence is available to show that Defendants never intended to pay for the trades: Selection Resources never paid for the trades despite repeated demands. [Dkt. 214, Ex. 31, Squillante Dep. at 124– 126]. Nevertheless, it is appropriate to infer that Defendants directed Dean Witter to purchase the shares and had no intention of paying for the trades, thereby violating Regulation T, because in addition to the fact that they did not pay for the trades, this Court has Ordered that ad-verse inferences may be drawn against Poirier and Palm based on their failure to disclose documents during discovery pertaining to Selection Resources and their affiliation with Vincent. Additionally, the Court has precluded Poirier and Palm from introducing into evidence any documents or testimony concerning Vincent and Selection Resources, including any Selection Resources brokerage accounts and any trading in such accounts, thereby precluding them from creating any triable issue of fact as their intention to pay for the stock trades made in the Selection Resources account at Dean Witter. [Dkt. 235].

Therefore, in drawing the adverse inferences against Defendants and in light of their failure to pay for the trades, the Court finds that Defendants have failed to raise a triable issue of material fact with respect to Plaintiff's claim that Defendants violated § 7(f). For this reason the Court will grant Plaintiff's Summary Judgment motion on this Count.

*Count IV—Violation of the Beneficial Ownership Provisions:*

█ Section 13(d) of the '34 Act requires any person who directly or indirectly acquires beneficial ownership or more than five percent of a class of stock registered under Exchange Act § 12, must, within five days of the acquisition, file a Schedule 13D with the SEC and send copies to the issuer and to each exchange upon which the security is traded. Similarly, § 16 of the '34 Act requires any person who beneficially owns, directly or indirectly, more than ten percent of a class of equity shares to file a report with the SEC. At the time that the individual acquires beneficial ownership of ten percent of the equity shares he is required to file this information on Form 3 and he must also file Form 5 at the end of each year that he continues to have beneficial ownership of ten percent of the equity shares.

Additionally, changes in beneficial ownership of the company's equity securities must be reported on Form 4.

Poirier, Palm and Vincent controlled at least 3.5 million trading shares of Garcis: the 500,000 issued to Palm and the 3 million shares issued to Vincent. This constituted approximately 31% of the 11,967,364 outstanding shares of Garcis and 89% of the 3,950,000 free trading shares of Garcis.[10] Because neither Poirier, Palm or Vincent filed Form 3, 4 or 5, there is no issue of triable fact as to whether they violated Sections 13(d) and 16 of the '34 Act.

Accordingly, the Court finds that Defendants have failed to raise a triable issue of material fact with respect to Plaintiff's claim that Defendants violated § 13(d) and § 16. For this reason the Court will grant Plaintiff's Summary Judgment motion on this Count.

### IV. Requests for Injunctive Relief

Section 20(b) of the '33 Act and § 21(d) of the '34 Act grant this Court discretion to enter a permanent injunction against any person who is engaged in or who is about to engage in actions that violate the securities laws. 15 U.S.C. §§ 77t(b) and 78u(d). In order to obtain a permanent injunction Plaintiff must show that Defendants previously violated the securities laws and that there is a reasonable likelihood that they would violate the securities laws in the future. *SEC v. Murphy*, 626 F.2d 633 (9th Cir.1980).

In order to assess the likelihood of future violations, the Court must evaluate the totality of the circumstances surrounding the violations, including: the degree of scienter involved; the isolated or recurrent nature of the violation; the defendant's recognition of the wrongfulness of the conduct; the likelihood, given the defendant's professional occupation, of future violations; and the sincerity of his assurances against future violations. *Id.* at 655 (citing *SEC v. Bonastia*, 614 F.2d 908, 912 (3rd Cir.1980)). Past violations may permit an inference that future violations will occur, and the fact that the Defendants are not presently engaged in any violations of the securities laws does not preclude the Court from issuing a permanent injunction. *Id.*

Plaintiff has presented clear evidence of multiple violations of the securities laws both in the present case and in past conduct. For example, in 1988, without admitting or denying liability, Poirier consented to allegations that he entered into agreements to purchase approximately $800,000 of securities without the intention or financial capability of making payment. [Dkt. 214, Ex. 100].[11] He also consented to violations of: Section 17(a) of the '33 Act; (2) Sections 7(f) and 10(b) of the '34 Act; (3) Rule 10b–5 promulgated under the '34 Act; and (4) Regulation X. In addition to this Court's finding that Defendants violated the securities laws, the SEC has found sufficient evidence to suspend

---

**10.** The totals for free trading and outstanding shares were drawn from the numbers provided in the Garcis investment package at Dkt. 214, Ex. 33. Defendants object to this exhibit on the grounds that it is not properly authenticated under Rule 56. The Court will not strike this exhibit for two reasons. First, after reviewing the exhibit, Squillante testified that "it appears to be or is substantially similar to the due diligence binder." [Dkt. 214, Ex. 31, Squillante Dep. at 32–36, 62]. Second, the exhibit contains numerous Garcis logos and identifying marks giving it distinctive characteristics as provided for in Rule 901(b)(4).

**11.** Defendants object to Exhibit 100 arguing that it has not been properly authenticated in accordance with Rule 56. This argument is meritless as the consent judgment is also available on Lexis and as such meets Rule 901(b)(7).

trading of Garcis stock and order Garcis securities deregulated.[12]

In assessing the factors discussed above, the Court concludes that there is strong evidence that Defendants are likely to violate the securities laws in the future. Given the egregious nature of the violations related to Garcis which occurred repeatedly over an extended period of time, prior violations of the identical provisions in 1988, and Defendants lack of assurances that any future violations will occur, injunctive relief is appropriate. *See also SEC v. Todt*, 2000 WL 223836 (S.D.N.Y. Feb. 25, 2000).

Accordingly, the Court will grant Plaintiff's request for a Permanent Injunction against future violations of: (1) Section 17(a) and 5(c) of the '33 Act; (2) Sections 7(f) and 10(b) of the '34 Act; (3) Rule 10b–5 promulgated under the '34 Act; and (4) Regulation X and Section 7(f) of the '34 Act.

## V. Disgorgement of Profits and Payment of Prejudgment Interest

 To prevent unjust enrichment and to deter others from violating the securities laws, the Court has broad equity powers to order Defendants to disgorge all illicit gains and impose prejudgment interest on those gains. *SEC v. Clark*, 915 F.2d 439, 453 (9th Cir.1990); *Knapp v. Ernst & Whinney*, 90 F.3d 1431, 1441 (9th Cir.1996)(citing *Frank Music Corp. v. Metro–Goldwyn Mayer, Inc.*, 886 F.2d 1545,

1550 (9th Cir.1989), *cert. denied*, 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 496 (1990)). Further, where two or more individuals or entities collaborate or have a close relationship in engaging in the violations of the securities laws, they have been held jointly and severally liable for the disgorgement of illegally obtained proceeds. *Hateley v. SEC*, 8 F.3d 653, 656 (9th Cir.1993).

 In assessing whether to order pre-judgment interest, the Court may consider the degree of personal wrongdoing on the part of the defendant. *Osterneck v. Ernst & Whitney*, 489 U.S. 169, 176, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989). Prejudgment interest is calculated in accordance with the delinquent tax rate as established by the Internal Revenue Service, IRC § 6621(a)(2), and is assessed on a quarterly basis. *SEC v. Lorin*, 877 F.Supp. 192, 201 (S.D.N.Y.1995); *aff'd in part, vacated in part*, 76 F.3d 458 (1996).

Both disgorgement and prejudgment interest are appropriate in this case. In the process of forming Garcis, merging it with Questex and then fraudulently promoting Garcis's stock, Poirier, Palm and Vincent sold both the Questex and Garcis stock for $2,026,442: Poirier and Palm received $123,136 in proceeds from the sale of Questex stock that was placed in the Selection Resources account at ADM and sold prior to the Questex/Garcis reverse acquisition and $1,903,316 in proceeds from the sale of Garcis stock.[13] The Garcis stock

12. On October 13, 1995, the SEC suspended trading of Garcis stock because of questions regarding the "accuracy and adequacy of publicly disseminated information concerning, among other things, the identity of the person in control of the operations and management of the company, the amount of sales and customer orders received by Garcis, and contracts entered into by Garcis." On April 10, 1997, an SEC ALJ ordered Garcis securities deregulated based on his finding that Garcis had filed annual and quarterly reports

that contained material misrepresentations, and had failed to file other required reports on a timely basis in violation of Section 13(a) of the '34 Act and the rules promulgated thereunder.

13. Plaintiff's supporting evidence is lengthy and for that reason will not be recounted for each transaction. However, based on the exhibits to the Plaintiff's motion, the amount of disgorgement is causally connected to Defendants' failure to disclose their control of Gar-

was distributed among various accounts and brokerage houses:

(1) Selection Resources' account at ADM in Phoenix through which Poirier directed the sale of 17,021 shares for proceeds of $81,365 which were then wired to a Select account at Bank One in Scottsdale.

(2) Selection Resources' account at Dean Witter Reynolds, Inc. in Orlando through which Poirier directed the sale of 20,100 shares for proceeds of $108,238 which were then wired to a Select account at Bank One in Scottsdale.

(3) Selection Resources' account at Berthel, Fisher & Co. in Minneapolis through which Poirier directed the sale of 43,151 shares for proceeds of $46,777 which were then wired to a Select account at Bank One in Scottsdale.

(4) Selection Resources' account at Yee, Desmond, Schroeder & Allen, Inc. in Phoenix through which Poirier directed the sale of 53,500 shares for proceeds of $92,453 which were then wired to a Select account at Bank One in Scottsdale.

(5) Peartree Investments, whose president was Poirier, maintained an account at Olsen Payne & Co. in Salt Lake City. Poirier directed the sale of 164,462 shares for proceeds of $334,527 which were wired to a Peartree account in Scottsdale.

(6) Palm's account at C.M. Oliver & Co. Limited in Vancouver through which Palm sold 54,000 shares for proceeds of $52,706.

(7) Palm's account at Union Securities in Vancouver through which Palm sold 390,000 shares for proceeds of $365,508.

(8) Several accounts maintained Yorkton Securities in Toronto. Palm sold 62,500 shares through Select's account proceeds of $99,834 which were wired to a Select account in Scottsdale. Palm also sold 324,500 shares out of his personal account for proceeds of $639,079 which were wired to a Select account in Scottsdale. Palm also had authority to trade in his son David's two Yorkton accounts. In those two accounts, Palm sold 65,600 shares for proceeds of $82,829. In total Palm sold 452,600 shares for proceeds of $821,742.

Plaintiff submits that prejudgment interest on these amounts from October 1, 1995 through the filing of this motion totals $633,719, in accordance with IRC § 6621(a)(2). Defendants have not submitted any materials disputing this calculation.

Accordingly, the Court will grant Plaintiff's Motion to disgorge the proceeds from the sale of Questex and Garcis stock and prejudgment interest in the amount of $2,660,161.

## VI. Civil Penalties

■ Plaintiff has also requested that the Court impose civil penalties in the amount of $100,000 each on Defendants Poirier, Palm and Vincent pursuant to § 20(d) of the '33 Act and § 21(d)(3) of the '34 Act. In doing so Plaintiff seeks imposition of "third tier penalties" against each Defendant. Third tier penalties are available only where the securities law violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement [and] such violation directly or indirectly resulted in

cis and Questex and their proceeds attributable to their material misstatements in press releases and investment packages. *See SEC v. First Pacific Bancorp,* 142 F.3d 1186, 1192 n. 6 (9th Cir.1998) (noting that the district court is not required to trace every dollar of disgorgement, but only has to provide a reasonable approximation of profits causally connected to a violation).

substantial losses or created a significant risk of substantial loss to other persons". 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).

In the instant case, Defendants violations involving fraud and deceit were numerous and ongoing. Further, Defendants' actions were extreme departures from the securities laws and created a significant risk of substantial loss to investors who purchased Garcis stock based on Defendants' fraudulent behavior. *See also SEC v. Rosenfeld*, 2001 WL 118612 (S.D.N.Y. Jan. 9, 2001). Accordingly, the Court will grant Plaintiff's motion with regard to civil penalties and impose upon each Defendant a $100,000 penalty.

The Court being fully advised,

**IT IS ORDERED** granting Plaintiff's Motion for Summary Judgment on: (1) Violation of the Anti-fraud provisions of the 1933 Securities Act and the 1934 Exchange Act; (2) Violation of the Registration Provisions of Section 5, (3) Violation of the Credit Extension Provisions of Section 7(f) and Regulation X promulgated thereunder; and (4) Violations of the Section 13(d) of the Securities Act and Section 16 of the Exchange Act. [Dkt. 212].

**IT IS FURTHER ORDERED** granting Plaintiff's Motion for Injunctive Relief. Defendants Poirier, Palm and Vincent are permanently enjoined from committing future violations of (1) Section 17(a) and 5(c) of the '33 Act; (2) Sections 7(f) and 10(b) of the '34 Act; (3) Rule 10b–5 promulgated under the '34 Act; and (4) Regulation X and Section 7(f) of the '34 Act.

**IT IS FURTHER ORDERED** granting Plaintiff's Motion for disgorgement of profits and payment of Prejudgment interest in the amount of $2,660,161.

**IT IS FURTHER ORDERED** granting Plaintiff's Motion for civil penalties. Poirier, Palm and Vincent are each ordered to pay $100,000.

**IT IS FURTHER ORDERED** that the clerk shall enter final judgment as to Defendants Poirier, Palm and Vincent.